454 S.E.2d 96

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Helen Jean HONAKER, Defendant Below, Appellant.**

**No. 21860.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 20, 1994.

Decided Dec. 15, 1994.

Michele L. Rusen, Pros. Atty. Parkersburg, for appellee.

Chauncey H. Browning, Charleston, for appellant.

CLECKLEY, Justice:

The appellant and defendant below, Helen Jean Honaker, appeals from her July 10, 1992, convictions of first degree murder with a recommendation of mercy and conspiracy to commit first degree murder. The charges and convictions stem from the July 21, 1990, murder of the defendant's stepson, W.D. Honaker.

Among the numerous errors asserted,[1] the defendant argues that certain statements made during treatment at a hospital and statements made to law enforcement authorities were improperly admitted. The defendant claims that her statements should have

---

1. Through her errors, the defendant alleges that the trial court erred in denying her motion *in limine* to exclude her utterances made while being treated at the Jackson General Hospital; in admitting the testimony of State's witnesses who were staff members from the hospital; in denying her motion to suppress statements made to officers on September 19, 1990; in admitting the testimony of various witnesses without allowing her to explain the testimony; in denying her motion for mistrial or acquittal for the State's failure to disclose exculpatory information; in granting the State's motions *in limine* to prohibit testimony about Jerry Mahood's efforts to have an excellmate killed; and in refusing certain instructions offered by the defendant while granting certain other instructions opposed by the defendant.

been suppressed because they were involuntary and, in the case of the statements to the authorities, the police engaged in a custodial interrogation warranting *Miranda* warnings. Under another group of errors, the defendant claims that the trial court erred in not allowing her to explain some of the prior testimony of other witnesses. These errors are alleged to be prejudicial, thus, warranting a new trial. For the reasons set forth in this opinion, we affirm the judgment of the Circuit Court of Jackson County.

## I.

### FACTS AND PROCEDURAL HISTORY

On July 21, 1990, W.D. Honaker was murdered in his home. Mr. Honaker was shot twice in the chest with a .12 gauge shotgun and struck in the head by a part of the shotgun. Jerry Mahood testified that he killed Mr. Honaker with the assistance of his friend and co-worker, James Westfall, at the request of the defendant.

In 1989, four years after their first meeting, the defendant and Mr. Mahood renewed their acquaintance and began an intimate relationship. The defendant's husband, Tommy Honaker, eventually became suspicious of the relationship between the defendant and Mr. Mahood and confronted Mr. Mahood. Mr. Mahood denied any relationship with the defendant, and Tommy Honaker threatened to kill Mr. Mahood if he found him around the defendant.

The defendant testified she was afraid that her husband would indeed kill Mr. Mahood, so she did not meet with him again until after W.D. Honaker was killed. Mr. Mahood testified, however, that the defendant spoke to him several times about her stepson. Furthermore, Mr. Mahood observed that the defendant was angry with W.D. Honaker, and was afraid that W.D. Honaker was going to kill her. According to Mr. Mahood, the defendant repeatedly asked him to find someone to kill her stepson. Mr. Westfall introduced Mr. Mahood to two different people, both of whom refused to kill W.D. Honaker.

According to Mr. Mahood, the defendant convinced him to kill her stepson for her. After he was unable to hire someone to commit the murder and after enlisting the aid of his friend, Mr. Westfall, Mr. Mahood planned the murder of W.D. Honaker. On the evening of July 21, 1990, Mr. Mahood and Mr. Westfall drove to a roadside park near the victim's house. Sometime before midnight, Mr. Mahood left the truck, walked up a hill to the victim's house, and shot him through the window screen. When the victim failed to fall, Mr. Mahood climbed through the window screen, and shot the victim again, and then struck him on the head with the shotgun. Mr. Westfall waited in the truck and, apparently, did not see the actual shooting. The victim's body was not discovered until the following Monday.

After the death of his son, Tommy Honaker became suspicious that Mr. Mahood was responsible for the murder and encouraged the police to investigate this possibility. It was at that time that Mr. Mahood admitted his affair with the defendant, but denied any connection with the murder.

After several weeks of investigation into the victim's death, the police questioned Mr. Westfall, who admitted his and Mr. Mahood's involvement in the murder. On August 23, 1990, Jerry Mahood and James Westfall were arrested and charged with the murder of W.D. Honaker. On the same day, but prior to the arrest of Mr. Mahood and Mr. Westfall, the State asserts that the defendant met with Mr. Mahood on two separate occasions. According to Mr. Mahood, the defendant's first visit was to his job site, where she questioned him and Mr. Westfall.

On the morning following Mr. Mahood's arrest, the defendant went to the jail and requested to speak to him. The defendant was told on two separate occasions that she could not see Mr. Mahood. However, Mr. Mahood and the defendant did manage to speak to each other a number of times on the telephone. The State claimed that it was through these telephone calls that the defendant was able to maintain her control over Mr. Mahood by telling him to keep his mouth shut and not tell anyone about her.

Apparently, the defendant could not control James Westfall. In November of 1990, Mr. Westfall entered into a plea agreement

with the State in which he agreed to testify against Mr. Mahood in exchange for the dismissal of certain charges. On April 5, 1991, the jury found Jerry Mahood guilty of first degree murder with a recommendation of mercy. Mr. Mahood testified that the defendant called him on the telephone on April 6, 1991, and made various statements to him, including telling him not to say anything and making a threat against Mr. Mahood's son if he did talk.

Shortly after her conversations with Mr. Mahood and her attorney, the defendant voluntarily ingested over seventy Excedrin P.M. and was taken to Jackson General Hospital where she was treated for an overdose. During four hours of treatment, some of the hospital staff testified that the defendant made a number of utterances. The statements were not in response to any questions posed by anyone and were not made in the presence of any law enforcement personnel. The hospital staff ultimately reported the defendant's statements to the appropriate authorities.

At the defendant's trial, Mr. Mahood testified that the defendant seemed happy after her stepson's death. This testimony mirrored a statement by the defendant to a law enforcement officer that she was relieved about the death. The defendant also made potentially incriminating statements to other law enforcement authorities and to two different private investigators. The aforementioned statements were introduced at trial.

On July 10, 1992, the defendant was sentenced to ten years to life on the murder charge and a consecutive sentence of one to five years on the conspiracy charge. The defendant's motion to set aside the jury verdict and for a new trial was denied by an order dated August 3, 1992. She now appeals these convictions.

## II.

### DEFENDANT'S STATEMENTS

In the first, second, and fifth assignments of error, the defendant contends that her inculpatory statements were involuntary and,

thus, should not have been admitted into evidence. Because all the assignments test the voluntariness component for an admissible statement, these three errors will be considered together. The first two errors challenge the admissibility of the defendant's utterances made while being treated for a drug overdose at Jackson General Hospital. The fifth assignment of error covers statements that the defendant made in the presence of Trooper Michael Comer, Chief Deputy Sheriff Walters, and Sergeant R.D. Estep of the Department of Public Safety.

### A.

### *Jackson General Hospital*

On April 6, 1991, the defendant purchased two bottles of Excedrin P.M. and ingested approximately seventy of the tablets. She was then rushed to Jackson General Hospital by ambulance. During the first hour of her treatment, the defendant muttered a number of potentially incriminating statements.[2] The State's witnesses from the hospital admitted that upon her arrival at the hospital, the defendant gave inappropriate responses to questions; was combative, confused, incoherent, and uncooperative; and unable to follow simple commands. The hospital staff eventually was forced to put the defendant in full restraints in order to treat her. Although the witnesses could not remember the exact words the defendant used, they all agreed that the statements covered the following areas: (1) that she loved and missed Jerry [presumably Jerry Mahood]; (2) that she paid for it; (3) that she paid for it all; and (4) that if she told the truth, they would put her in jail.

In a pretrial motion, the defendant sought to exclude her utterances from the hospital visit. Following a full suppression hearing, on November 14, 1991, the trial court issued an order finding that the statements were admissible. The motion to suppress was not renewed or revisited at the trial itself. The defendant did assign the trial court's denial of her pretrial motion as one of her post-trial grounds for setting aside the jury verdict.

---

2. The three members of staff that testified to the defendant's utterances were Dr. Britt Williams, and two nurses, Ms. Sarah Moore and Ms. Carol Welling.

Now, on appeal, the defendant renews both her earlier arguments.

■ We review *de novo* legal conclusions involved in suppression determinations. The factual determinations involving those legal conclusions are reviewed under the clearly erroneous standard. *State v. Farley,* 192 W.Va. 247, 452 S.E.2d 50 (1994); *State v. Stuart,* 192 W.Va. 428, 452 S.E.2d 886 (1994). In Syllabus Point 1 of *State v. Farley, supra,* we state:

> " " " 'A trial court's decision regarding the voluntariness of a confession will not be disturbed unless it is plainly wrong or clearly against the weight of the evidence.' Syllabus Point 3, *State v. Vance,* 162 W.Va. 467, 250 S.E.2d 146 (1978)." Syl.Pt. 7, *State v. Hickman,* 175 W.Va. 709, 338 S.E.2d 188 (1985).' Syllabus Point 2, *State v. Stewart,* 180 W.Va. 173, 375 S.E.2d 805 (1988)."

As in *Farley,* we are again presented with an inadequate record that does not facilitate a complete and thorough review of these important issues. In this case, neither the defendant nor the State made available to this Court the transcript of the suppression hearing. We have before us the written order of the trial court reflecting only that the trial court admitted the statement and denied the motion to suppress. The order does not contain the trial court's findings of fact or a summarization of the evidence.

■ In a long line of unbroken precedent, this Court has held that the responsibility and burden of designating the record is on the parties [3] and that appellate review must be limited to those issues which appear in the record presented to this Court. *Thornton v. CAMC,* 172 W.Va. 360, 364, 305 S.E.2d 316, 320–21 (1983).[4] In regard to situations where we do not have the benefit of the lower court's findings, we recently held in Syllabus Point 3, in part, of *State v. Farley, supra:*

> "[W]here a trial court admits a confession without making specific findings as to the totality of the circumstances, the admission of the confession will nevertheless be upheld on appeal, but only if a reasonable review of the evidence clearly supports voluntariness."

■ Although we are unable to review the specific findings of the trial court, the record clearly demonstrates that the motion to suppress was denied. We also have held that the voluntariness of a confession nevertheless may be upheld on appeal without specific findings as to the totality of the circumstances "if a reasonable review of the evidence clearly supports voluntariness." *Farley,* 192 W.Va. at 252, 452 S.E.2d at 57. *See also United States v. Carter,* 569 F.2d 801 (4th Cir.1977), *cert. denied,* 435 U.S. 973, 98 S.Ct. 1618, 56 L.Ed.2d 66 (1978); *United*

---

**3.** *See O'Neal v. Peake Operating Co.,* 185 W.Va. 28, 404 S.E.2d 420 (1991).

**4.** It has been suggested that the record is vitally important to a successful appeal:

"The designation of the record is important. A court of record speaks only by its record is the general rule. *State v. Nuckols,* 152 W.Va. 736, 166 S.E.2d 3 (1968). Where the record that has been designated is silent, it is presumed that a court of competent jurisdiction performed its duties in all respects as required by law, the only exception being the assistance of counsel. *State ex rel. Scott v. Boles,* 150 W.Va. 453, 147 S.E.2d 486 (1966). Not only must the significant portion of the record relating to that alleged error be identified, the precise part of the record must be designated. Otherwise, the error will be treated as nonexisting. *See State v. Flint,* [171 W.Va. 676], 301 S.E.2d 765 (W.Va.1983)." II Franklin D. Cleckley, *Handbook on West Virginia Criminal Procedure* 497–98 (1993).

It is counsel's obligation to present this Court with specific references to the designated record that is relied upon by the parties. The failure of counsel to file the appropriate parts of the record below makes it difficult for this Court to read the parties' briefs and understand their arguments. In this context, counsel must observe the admonition of the Fourth Circuit that " '[j]udges are not like pigs, hunting for truffles buried in briefs' [or somewhere in the lower court's files].... We would in general admonish all counsel that they, as officers of this Court, have a duty to uphold faithfully the rules of this Court." *Teague v. Bakker,* 35 F.3d 978, 985 n. 5 (4th Cir.1994), *quoting United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991). We serve notice on counsel that in future appeals, we will take as nonexisting all facts that do not appear in the designated record and will ignore those issues where the missing record is needed to give factual support to the claim.

---

*States v. Lewis,* 528 F.2d 312 (4th Cir.1975). Because the dispositive issue is one of law and is not necessarily dependent upon factual development, we find that we are able to decide the voluntariness issue without the transcript of the suppression hearing.[5]

The defendant urges us to find that her statements made in the presence of hospital personnel were involuntary under the Fourteenth Amendment to the United States Constitution and Section 10 of Article III of the West Virginia Constitution. Specifically, the defendant contends that her statements made in the hospital were rendered involuntary by her ingestion of seventy tablets from two bottles of Excedrin P.M. The State responds by suggesting that because her alleged incapacity was self-induced and not in any way caused by the police, the defendant has failed to establish the most essential element of her constitutional claim of involuntariness, *i.e.,* state action. Thus, the question as formulated by the parties to this appeal is whether a confession may be ruled "involuntary" in the absence of police involvement. We agree with the State; and, to resolve the existing conflict among West Virginia cases, we hold that police involvement is a prerequisite for finding a confession involuntary. Under the West Virginia Constitution, the voluntariness of a confession for due process purposes turns solely on the constitutional acceptability of the specific police conduct at issue. In ruling as we do today, we observe that while the personal characteristics of a defendant may be considered in determining the admissibility of a confession under Rules 401 through 403 of the West Virginia Rules of Evidence, personal characteristics such as the mental condi-

tion or the subjective state of mind of a defendant by themselves and apart from their relation to official or police involvement are not significant in deciding the voluntariness question.

Initially, the defendant cites *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), *overruled, Keeney v. Tamayo-Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), for her assertion that to determine whether a confession is voluntary, the test is solely whether the statement was the product of the defendant's rational intellect and freewill. Under this theory, the defendant contends, a statement must be the product of freewill and an impairment or disability can make an accused's statements involuntary even independently of some official involvement.[6]

There are several aspects of the defendant's argument that have surface appeal. Indisputably, "[a] confession that has been found to be involuntary in the sense that it was not product of the free will of the defendant cannot be used by the State for any purpose at trial." Syllabus Point 2, *State v. Goff,* 169 W.Va. 778, 289 S.E.2d 473 (1982). Similarly, a statement not the product of a defendant's rational intellect and freewill may very well be unreliable and lacking in probative value. Modern constitutional analysis of the voluntariness claim does not end, however, by a finding of "testimonial worthlessness." *See State v. Goldizen,* 93 W.Va. 328, 116 S.E. 687 (1923). Rather, the important considerations "that courts have identified in assessing the voluntariness of a confession can be broken down into broad categories: the police conduct involved *and* the

---

5. We believe that it is significant that the State does not object or protest the failure of the defendant to designate as part of the record the suppression hearing transcript. Moreover, both parties to this appeal rely on the trial facts to support their respective positions. In our recent cases, we have made clear that a defendant is not permitted to rely on facts developed only at the trial to support an appeal emanating from a pretrial ruling unless the objection is renewed at trial at the time the "tainted" evidence is offered. *See State v. Derr,* 192 W.Va. 165, 451 S.E.2d 731 (1994); *State v. Farley, supra.* Because the State relies on the facts from the trial and there has been no objection by the State to the absence of

the suppression transcript, we will assume for purposes of this appeal that the facts developed at trial were substantially similar to those presented to the trial court at the suppression hearing.

6. The defendant cites a number of cases from various jurisdictions to support the proposition. Under the defendant's theory, it does not matter how freewill is overborne, but that it is. Thus, a confession should not be admissible if it is the product of physical intimidation, psychological pressure, or the result of the ingestion of alcohol or drugs.

characteristics of the accused." Charles H. Whitebread & Christopher Slobogin, *Criminal Procedure* 369 (3rd ed. 1992). (Emphasis added).[7]

Concededly, prior West Virginia case law has not contributed to a clear understanding of what constitutes an involuntary statement within the Due Process Clauses of the Fourteenth Amendment to the United States Constitution and Section 10 of Article III of the West Virginia Constitution. Several West Virginia cases relied upon by the defendant have in fact held that the individual characteristics of the accused at the time a confession is given may be the controlling, if not the dispositive factor in determining whether the confession is admissible. *State v. Sanders*, 161 W.Va. 399, 403, 242 S.E.2d 554, 556 (1978) ("[o]ne can voluntarily make an admission or a confession to any listener"), *overruled on other grounds, State ex rel. White v. Mohn*, 168 W.Va. 211, 283 S.E.2d 914 (1981); *State v. Muegge*, 178 W.Va. 439, 444, 360 S.E.2d 216, 221 (1987) ("defendant may, however, raise the issue of whether a statement made to a private party was voluntary"). On the other hand, a line of West Virginia cases have held that State action was required before a confession was to be excluded on constitutional grounds. *State v. Rush*, 108 W.Va. 254, 150 S.E. 740 (1929) (statement must be to a person in authority); *State v. Dotson*, 96 W.Va. 596, 123 S.E. 463 (1924) (statement to private law partner of the prosecuting attorney not to State officer); *State v. Morgan*, 35 W.Va. 260, 13 S.E. 385 (1891) (inducement must come from one in authority).

While some egregious police practices may be sufficient in and of themselves to invalidate a confession under the voluntariness standard, the better reasoned cases are clear that personal characteristics, alone or in conjunction with others, cannot invalidate a confession in the absence of some official involvement. *See Procunier v. Atchley*, 400 U.S. 446, 91 S.Ct. 485, 27 L.Ed.2d 524 (1971).[8]

In the seminal case of *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), the requirement of police involvement was constitutionalized. In *Connelly*, the defendant approached police officers and informed them that he wanted to confess to a murder that he had committed. The police Mirandized the defendant on two separate occasions. It was later determined via a psychiatric evaluation that the defendant suffered from a form of psychosis that interfered with his ability to make free and rational choices. The lower courts held that the defendant's mental condition precluded him from making a valid waiver of his *Miranda* rights. The United States Supreme Court, however, reversed the case holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Connelly*, 479 U.S. at 167, 107 S.Ct. at 522, 93 L.Ed.2d at 484.

We share the opinion of the Supreme Court that police involvement must be evident before a statement is considered involuntary under the West Virginia Due Pro-

---

7. This Court has recognized that threats and intimidation or promises are sufficient to undermine a defendant's freewill. *See State v. Goff, supra;* Syl. pt. 1, *State v. Burgess*, 174 W.Va. 784, 329 S.E.2d 856 (1985) (" '[w]hen the representations of one in authority are calculated to foment hope or despair in the mind of the accused to any material degree, and a confession ensues, it cannot be deemed voluntary.' Syllabus, *State v. Parsons*, 108 W.Va. 705, 152 S.E. 745 (1930)"); Syl. pt. 4, *State v. Smith*, 186 W.Va. 33, 410 S.E.2d 269 (1991) (statements made under torture are unreliable). However, the point that ties these cases together is not that the statements were not freely made, but that there was improper or coercive governmental action.

8. Writing for the Court in *Rogers v. Richmond*, 365 U.S. 534, 540–41, 81 S.Ct. 735, 739, 5 L.Ed.2d 760, 766 (1961), Justice Frankfurter observed that "[o]ur decisions under that [Fourteenth] Amendment have made clear that convictions following the admission into evidence of confessions which are involuntary cannot stand * * * so not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system." *See also State v. Farley*, 192 W.Va. at 254 n. 8, 452 S.E.2d at 57 n. 8 ("voluntariness" not "reliability" is the decisive factor in determining the existence of a constitutional violation in the admission of a confession).

cess Clause. To the extent that *State v. Sanders, supra,* and *State v. Muegge, supra,* hold otherwise, they are expressly overruled.

To the limited extent discussed above,[9] this Court applies the rationale of *Connelly* and we find that the trial court properly admitted the defendant's statements in the absence of some evidence that the defendant was officially coerced or encouraged into making the statements during her hospital visit. Thus, we find it unnecessary under this assignment of error to examine whether the defendant's will was overborne since we find there is simply no official involvement. As suggested by the Court in *Connelly,* in the absence of police involvement "suppressing [the defendant's] statements would serve absolutely no purpose in enforcing constitutional guarantees." 479 U.S. at 166, 107 S.Ct. at 521, 93 L.Ed.2d at 484.

 We also agree with the Court in *Connelly* that absent evidence indicating some official involvement in the taking of statements, the admissibility of the defendant's statements must "be resolved by state laws governing the admission of evidence." 479 U.S. at 167, 107 S.Ct. at 521, 93 L.Ed.2d at 484. To be specific, we now hold that the basis for excluding a statement exclusively between private persons when its reliability is in doubt is Rules 401 through 403 of the West Virginia Rules of Evidence and not the Due Process Clause. Because the defendant did not specifically object to the admission of the statements on evidentiary grounds, we consider any error on these grounds not to be preserved. *See* W.Va.R.Evid. 103(a)(1).[10]

## B.

### *Police Interview*

The defendant presents a more challenging argument in her fifth assigned error. Under this error, she contends that her statements in the presence of law enforcement officials should have been suppressed because she was not Mirandized and her statements were involuntary. Conducting the same analysis as we did for the first two errors, we must determine whether or not her statements could be considered involuntary under the Fourteenth Amendment's Due Process Clause and Section 10 of Article III of the West Virginia Constitution. Additionally, we must ascertain whether Trooper Comer's testimony at trial should have been suppressed since he did not Mirandize the defendant.

On September 19, 1990, Trooper Michael Comer asked the defendant to come to his office for purposes of taking a polygraph examination. Trooper Comer's notes indicate that she was asked to submit to a polygraph examination based on answers given at an interview conducted on September 4, 1990, with another officer.[11] Trooper Comer

9. Today's holding is limited to cases involving the total absence of police involvement. In cases where there is some police involvement, the personal characteristics of the defendant take on added significance. In Syllabus Point 6 of *State v. Worley,* 179 W.Va. 403, 369 S.E.2d 706, *cert. denied,* 488 U.S. 895, 109 S.Ct. 236, 102 L.Ed.2d 226 (1988), this Court states: "Misrepresentations made to a defendant or other deceptive practices by police officers will not necessarily invalidate a confession *unless they are shown to have affected its voluntariness or reliability."* (Emphasis added). We do not accept *Connelly* 's total rejection of reliability as a relevant consideration under West Virginia constitutional law. *See* George Dix, *Federal Constitutional Confession Law: The 1986 and 1987 Supreme Court Terms,* 67 Texas L.Rev. 231, 272, 275–76 (1988) (*"Connelly* does not defend its rejection of reliability on the merits. Instead, the opinion misleadingly represents that the Court's prior decisions definitively settled the matter, when in fact, until *Connelly,* reliability played an important role in traditional confession law analysis").

10. Under today's ruling, where there is no police involvement, trial courts are required to determine the admissibility of confessions under the West Virginia Rules of Evidence. Prior cases holding that intoxication, drug abuse, and insanity may render a confession inadmissible are not affected by this decision. *See State v. Cook,* 175 W.Va. 185, 332 S.E.2d 147 (1985); *State v. Hall,* 174 W.Va. 599, 601, 328 S.E.2d 206, 208 (1985) (drug usage "may have some bearing upon the reliability of the statements"); *State v. Young,* 173 W.Va. 1, 311 S.E.2d 118 (1983) (intoxication may bar admission of a confession if the defendant is unable to appreciate his action). We make explicit, however, that the basis of analysis must be Rules 401 through 403 of the Rules of Evidence rather than the voluntariness standard.

11. The defendant does not dispute that the September 4, 1990, statement was voluntary. During the earlier interview, the officer immediately informed the defendant that she was not under arrest and explained to her that she could leave at any time and could refuse to answer questions.

conducted the defendant's interview in the presence of Chief Deputy Sheriff Walters, and Sergeant R.D. Estep of the Department of Public Safety. The defendant initially agreed to take the polygraph examination, but she refused when she was advised that the questions would cover personal matters.[12] After the defendant refused to take the polygraph examination, Trooper Comer continued to ask her questions over the next three to three and one-half hours. The officers did not arrest or Mirandize the defendant during this interview. In her brief, the defendant states that her testimony at the suppression hearing indicates that she came to the office at the request of Trooper Comer and that she felt that she could not leave. The defendant relies on *State v. Smith, supra,* as authority for the suppression of the confession under these circumstances.

 The record is devoid of any evidence indicating that the defendant's statements to the police were the result of any undue treatment or coercion by the police. Nor do we find any reason to believe that the defendant's capacity to give a voluntary statement was impaired. Typically, cases where courts have determined that the accused's statements were involuntary involve serious deprivations of rights, including unlawful inducement, physical assault by the police, or prolonged questioning. For instance in *Smith, supra,* the defendant was not only arrested, but was forced to undergo seven hours of "booking." There was significant evidence that he had been assaulted by the arresting officers.[13] There is no indication of police overreaching or misconduct in this case. Significantly, the record does not bear out the defendant's claim that she was forced

to remain at the police station for questioning purposes. Interestingly, this was not the first time the defendant was questioned by the police. At the time of the questioning, she was only one of many general suspects and had not been taken into custody or placed under arrest. Thus, we find that the trial court was correct in denying the involuntariness claim.

 The defendant next claims that her statements were improperly admitted because she was not Mirandized. In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court found that a defendant should be apprised of certain constitutional rights in a custodial interrogation situation. Two elements must be present before *Miranda* warnings are required: first, the person must be in custody, and, second, he or she must be interrogated. *See Miranda v. Arizona,* 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706 (defining custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way").

 We recently discussed at length the requirements for custodial interrogation in *State v. Hopkins,* 192 W.Va. 483, 453 S.E.2d 317 (1994). Relying on the *per curiam* opinion in *Stansbury v. California,* —— U.S. ——, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994), we adopted the "objective circumstances" test to resolve when a person is in custody for purposes of *Miranda.* Thus, the question whether a person is in custody for purposes of *Miranda* requirements is answered by the objective circumstances of the interrogation.

---

**12.** The defendant was afraid the officers would question her about her alleged rape by the victim; the paternity of her son (the defendant claims that her son was the product of the rape by the victim and not the result of her marriage); and her relationship with Mr. Mahood. Trooper Comer's notes indicate that the defendant claimed she was afraid to take the polygraph examination because of things that might come out in a divorce hearing.

**13.** For some United States Supreme Court cases that are better indicators of police overreaching, see generally, *Connelly, supra,* and cases cited therein; *Mincey v. Arizona,* 437 U.S. 385, 98

S.Ct. 2408, 57 L.Ed.2d 290 (1978) (defendant subjected to four hours of interrogation while incapacitated and sedated in the intensive care unit of a hospital); *Beecher v. Alabama,* 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967) (police held gun to head of injured defendant in order to extract confession); *Reck v. Pate,* 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961) (mentally retarded defendant was held and questioned for four days with little food and inadequate medical attention until he confessed); *Ashcraft v. Tennessee,* 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944) (defendant questioned by police for over 36 hours without being allowed to sleep).

It does not depend on the subjective view of either the person interrogated or the officers who conduct the interrogation. In *Stansbury*, the Supreme Court concluded that the California court had given too much weight to the fact that the investigation had not yet "focused" on the defendant because it appeared that the court had regarded that fact, indicative of the interrogating officers' subjective views, as significant in itself and not only as bearing on the objective circumstances. Nevertheless, the parties disagreed on whether the objective facts in the record supported a finding that the defendant was in custody. Concluding that the California court should consider this question in the first instance, the Supreme Court remanded the case.

Applying the "objective circumstances" test to the facts in *Hopkins*, this Court found that because the defendant was not placed under arrest nor otherwise physically touched or restrained, "a reasonable person would not have felt ' "the compulsive aspect of custodial interrogation[.]" ' " 192 W.Va. at 488, 453 S.E.2d at 322, *quoting Stansbury*, — U.S. at —, 114 S.Ct. at 1529, 128 L.Ed.2d at 299.

■ Similarly, in the case *sub judice*, we can find no evidence, other than the defendant's self-serving statement, that she was in custody. When we focus on the objective facts, we note that the defendant voluntarily went to the police station for purposes of taking a polygraph examination. When she indicated her desire not to undergo the polygraph examination, the police did not pursue

it any further. She refused to take the polygraph out of fear of what the questions would cover, and she was permitted to do so. At no time was she placed under arrest or in any way physically restrained. She had prior knowledge about police questioning procedures in that she had been questioned a number of times previously by the police and she did not make any incriminating statements. It is reasonable to assume that she understood that she was not obligated to answer any questions and that, based on prior experiences, she was free to leave. The defendant has failed to present us with any objective evidence to show that she was subjected to custodial interrogation requiring *Miranda* warnings. We find, therefore, that the trial court properly admitted the statements of the defendant that were made to the law enforcement officers.[14]

### III.

### COLLATERAL ACTS AND EVENTS EVIDENCE

The defendant argues in her third, fourth, sixth, and seventh assigned errors that the trial court committed reversible error in admitting statements made to various people and not allowing her the opportunity to explain her motivation for making the statements. These four errors will be considered together.

Prior to trial, the defendant made motions *in limine* pursuant to Rule 404(b) of the West Virginia Rules of Evidence to exclude any evidence of collateral or other bad acts,[15]

14. At first blush, the facts of this case are remarkably similar to those in *State v. Hamrick*, 160 W.Va. 673, 236 S.E.2d 247 (1977). In *Hamrick*, the defendant was asked to come to the police station where she was questioned without being given the *Miranda* rights. The significant difference is that in *Hamrick* this Court implicitly suggested that the police took advantage of the defendant's mental deficiencies. This Court emphasized that the defendant was poor, illiterate, and mentally ill; and because of her mental condition, she could not knowledgeably and intelligently waive her right to counsel. It is entirely conceivable that the confession in *Hamrick* would have been involuntary even under the rationale of *Colorado v. Connelly, supra*. In comparison, there is no evidence of mental disability in the case at bar. We hold that in the absence of mental disability, police station interrogation

is controlled by *State v. Wyant*, 174 W.Va. 567, 328 S.E.2d 174 (1985) (no custody where the suspect voluntarily goes to the police station for questioning); *United States v. Jones*, 818 F.2d 1119 (4th Cir.1987) (accord). Indeed, *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), and *California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), make it plain that *Miranda* may not apply even when the police questioning takes place at the station house. The dispositive fact in these cases was both defendants voluntarily came to the station for questioning.

15. The defendant did not want evidence about the arson of her neighbor's house, her rape, or the paternity of her son introduced into evidence.

and to sever counts three through six [16] from the murder and conspiracy charges in counts one and two of the indictment. These motions were granted.

Prior to the opening statements, defense counsel reminded the trial court and the prosecution of the trial court's pretrial ruling that the alleged rape, paternity of the defendant's son, and the arson could not be discussed at trial. However, after the prosecution had introduced the defendant's statements, the defense requested an opportunity to explain the meaning of these various statements. As pointed out by the prosecution, these explanations would have opened the door to information that had been previously foreclosed by the defendant's *in limine* motion. The trial court refused to allow the defendant's partial explanation. However, to accommodate the defendant, the trial court indicated several times his willingness to reverse its prior rulings on the collateral evidence. Each time the defendant refused the trial court's offer. In the end, no collateral evidence was presented to the jury.

The defendant argues that the trial court's refusal to allow her an opportunity to explain prior testimony placed the defendant in a strategically untenable situation that was so prejudicial that she was denied a fair trial. The defendant fails to cite or direct us to any helpful law on this subject, and we can find none that would sustain the defendant's position.

The difficulty with the defendant's position is that there is no record error. In essence, the defendant was told by the trial court that she could not have the benefits of both the *in limine* ruling and also introduce evidence that would effectively make the prohibited evidence relevant and, thus, subject to rebuttal. As trial lawyers must necessarily do, counsel for the defense made a choice. In this case, the choice was to decline the offer of the trial court to set aside the motion *in limine* ruling. To now ask this Court to find prejudicial error is tantamount to asking this

Court to speculate on what could have happened. To the contrary, this Court may only find reversible error based on evidence that was introduced at trial and not what might have been presented.

There is some authority supporting the notion that a trial court's pretrial ruling interfering with the basic trial rights of a criminal defendant may be the subject of successful appeal. This Court, for example, has reversed trial courts when an erroneous pretrial ruling effectively denied a defendant the right to testify on his own behalf. *See State v. McKinney*, 161 W.Va. 598, 244 S.E.2d 808 (1978) (the lower court erred when it erroneously denied the defendant's motion to preclude disclosure of any prior criminal record which resulted in denying the defendant his right to testify). This case is unlike *McKinney*, however, because the defendant in this case had a choice. The defendant could have requested that the trial court reverse its earlier ruling, and then she would have been permitted to give any explanation that was relevant. If the trial court had allowed the collateral evidence to be presented to the jury, she could have preserved her claim of error by objecting under Rules 401 through 403 of the West Virginia Rules of Evidence. If this had occurred and the defendant was convicted, this Court could fully evaluate the prejudice claimed. Since defense counsel decided that the better strategy was to keep out the collateral evidence, the defendant cannot now claim that she was prejudiced by the trial court's ruling.

Counsel cannot forget that the proper function of a motion *in limine* is to prevent the jury from hearing prejudicial issues. Once granted, motions *in limine* apply to both parties. *See Porter v. Ferguson*, 174 W.Va. 253, 324 S.E.2d 397 (1984) (mistrial granted on State's motion when the defense failed to comply with *in limine* motion.) [17] The defendant in this case refused to take advantage of her opportunity at trial to ex-

---

16. In addition to murder and conspiracy to commit murder, in counts three through six of the indictment, the defendant was charged with arson, burglary, grand larceny, and conspiracy in connection with the burning of Hannah and Robert Snodgrass's house in June, 1990.

17. Notably, *Porter* did not involve the defense's violation of their own *in limine* motion.

plain her statement and she must, therefore, suffer the consequences of her choice. Thus, any harm flowing from the trial court's willingness to permit the prosecution to rebut the explanations of the defendant with collateral evidence is, as stated by the United States Supreme Court, "wholly speculative.... [T]o raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify." *Luce v. United States*, 469 U.S. 38, 41–43, 105 S.Ct. 460, 463–64, 83 L.Ed.2d 443, 447–48 (1984). Thus, to raise and preserve for appellate review the claim of improper impeachment of the defendant or improper rebuttal by the use of prejudicial collateral evidence, a defendant must testify or the rebuttal evidence must be introduced at trial.

## IV.

### REMAINING ERRORS

The defendant's remaining three errors are without merit and will not be discussed in this case.

## V.

### CONCLUSION

For the foregoing reasons, we find that the record does not support reversal of the jury verdict. Therefore, the judgment of the Circuit Court of Jackson County is affirmed.

Affirmed.

BROTHERTON, C.J., did not participate.

MILLER, Retired Justice, sitting by temporary assignment.