*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MICHAEL LOUIS WAGNER, | ) | |
| | ) | Supreme Court No. S-15419 |
| Petitioner, | ) | Court of Appeals No. A-10870 |
| | ) | |
| v. | ) | Superior Court No. 3AN-06-11374 CR |
| | ) | |
| STATE OF ALASKA, | ) | O P I N I O N |
| | ) | |
| Respondent. | ) | No. 7000 – April 24, 2015 |
| | ) | |

Petition for Hearing from the Court of Appeals of the State of Alaska, on appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Michael L. Wolverton, Judge.

Appearances: Marjorie Mock, Contract Attorney for the Public Defender, Anchorage, and Quinlan Steiner, Public Defender, Anchorage, for Petitioner. Elizabeth T. Burke, Assistant Attorney General, Office of Special Prosecutions & Appeals, Anchorage, and Craig W. Richards, Attorney General, Juneau, for Respondent.

Before: Fabe, Chief Justice, Stowers, Maassen, and Bolger, Justices. [Winfree, Justice, not participating.]

BOLGER, Justice.

## I. INTRODUCTION

The superior court ruled that the prosecution could use Michael Wagner's police interview to impeach him if he took the stand at his murder trial. Wagner contends

that the police violated his right to remain silent and that the court's ruling prevented him from testifying. But on this record, it is impossible to tell whether the court's ruling affected Wagner's decision not to testify, whether the prosecution would have impeached him with his police statement, or whether this evidence would have affected the jury. We conclude that Wagner has not preserved his *Miranda* claim for appellate review.

## II.    FACTS

Michael Wagner shot and killed his landlord, Steven Key, in October 2006. Wagner was living in the mother-in-law unit behind Key's house, and Key's body was found in that unit. Wagner has never denied responsibility for Key's death but has consistently claimed that the shooting was an accident.

On the night of the shooting, Wagner called Key reporting the smell of gas in the mother-in-law unit. Key walked over to the unit and stayed for about 13 minutes.[1] Wagner called Key again about an hour later, and Key returned to the mother-in-law unit. Within seconds of his arrival, Key was shot once through the head.

Wagner called 911 almost immediately. He told the dispatcher that Key had been shot, and he claimed that the shooting "was a[n] accident. [I was] showing the gentleman a pistol and it went off. . . . He's on the ground. I can't do nothing about it. He's in the house. . . . I don't know what to do. . . ."

When the police arrived at Wagner's mother-in-law unit, they found Key's body on the ground by the door and Wagner sitting on a couch. An officer arrested Wagner, placed him in the back of a patrol car, and drove him to the police station. At the station, Wagner was taken to an interview room.

---

[1]    The duration of Key's visit was recorded by a video camera Wagner had installed outside the mother-in-law unit. In conjunction with Wagner's phone records, this video recording provided a timeline of the events leading up to the shooting.

About an hour later, two homicide detectives arrived to question Wagner. The detectives read Wagner his *Miranda* rights,[2] and Wagner indicated that he understood each right. The detectives then asked whether Wagner wished to talk to them, and Wagner responded:

> Well, it sounds like if I do that you're gonna already make up a decision. I'm gonna need a lawyer then. I mean, if I say a bunch of stuff, I mean, if I don't know what I'm talking about or whatever, then I'm in a — I mean, it was a pure accident. You know, I mean, I — I just screwed up. I just bought the gun, blah, blah.

Shortly thereafter, Wagner stated:

> I'd rather have a lawyer, 'cause that would be I think the only way, 'cause otherwise, 'cause — I'm not there and if I say something, so — about — if I do, I don't know. I mean, it was [a] pure accident, man.

The detectives asked whether Wagner had an attorney or wanted a phone book to try to contact one. Wagner responded: "Uh, [what did] you mean, [if] I don't have [an] attorney, then one will be appointed?" The detectives answered: "No. What [will] happen is only if you're charged with a crime and then once you appear in court, you can request one or they'll appoint one for you. Right now, somebody's not charged with anything. There's nothing in the system that appoints you one."

Upon learning he had not yet been charged, Wagner stated, "Oh, well, then I'll tell you the whole thing, 'cause I'm not — I thought you had to — I thought you were already doing something, 'cause there's no problem for me. . . . It was a[n] accident." The detectives left the room for a few minutes and consulted with a prosecutor. When they returned, the detectives reiterated that no one had been charged, and that "until somebody is actually charged the court doesn't appoint an attorney." They also repeated

---

[2]    *See Miranda v. Arizona*, 384 U.S. 436, 467-73 (1966).

that "it's still important that you understand that you do have the right to have an attorney present." Finally, they asked Wagner, "Would you like to contact [an] attorney or would you like to talk to us about what occurred?" Wagner replied: "I need no attorney. Just ask me your questions." The detectives then interrogated Wagner for the next hour and a half.

## III. PROCEEDINGS

A grand jury indicted Wagner for first-degree murder, second-degree murder, and manslaughter. The indictment was later dismissed when the superior court ruled that Wagner had invoked his Fifth Amendment right to counsel before speaking to the detectives, that his statement was obtained after this invocation and in violation of *Miranda*, and that the indictment was based at least in part on this statement. Following this dismissal, a second grand jury indicted Wagner on the same charges without being presented with Wagner's statement to police.

Before trial, Wagner moved in limine to suppress the use of his statement for impeachment purposes if he chose to testify at trial. The superior court denied the motion, citing *State v. Batts*.[3]

The superior court held a jury trial, and the jury convicted Wagner of first-degree murder. Wagner did not take the stand at trial, but he later testified and was cross-examined at his sentencing hearing about the circumstances of the shooting.

Wagner appealed his conviction, claiming the superior court erred by denying his suppression motion. The court of appeals affirmed the conviction, concluding that Wagner had failed to preserve his claim by declining to testify.[4] Wagner

---

[3]     195 P.3d 144 (Alaska App. 2008).

[4]     *Wagner v. State*, Mem. Op. & J. No. 6008, 2013 WL 6576741 (Alaska App. 2013).

filed a petition for hearing in this court, urging us to reject the court of appeals' preservation holding. He further argues that article I, section 9 of the Alaska Constitution prohibits the use of his statement for impeachment. We granted the petition in whole.

## IV. DISCUSSION

The court of appeals declined to consider Wagner's claim that the superior court erred by ruling that the State could use his statement to impeach his testimony. The court of appeals concluded that, under the preservation rule of *Luce v. United States*[5] and *State v. Wickham*,[6] Wagner waived this claim by failing to testify. Wagner argues that the *Luce/Wickham* preservation rule should not have been applied to his case.[7]

### A. The Preservation Rule Of *Luce v. United States* And *State v. Wickham*

In *Luce*, the U.S. Supreme Court held, as a matter of federal procedural law, that "to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify."[8] The Court was concerned about the amount of speculation required to review an in limine ruling on the admissibility of impeachment evidence that is never introduced because the defendant declines to take the stand.[9] And

---

[5]     469 U.S. 38, 43 (1984).

[6]     796 P.2d 1354, 1357 (Alaska 1990).

[7]     Whether a claim has been preserved for appeal is a question of law, which we review de novo. *Cf. Wilkerson v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 993 P.2d 1018, 1021 (Alaska 1999) ("We apply our independent judgment when reviewing an intermediate appellate court's finding of waiver due to inadequate briefing.").

[8]     469 U.S. at 43; *see also* Fed. R. Evid. 609(a).

[9]     *Luce*, 469 U.S. at 41-43.

the Court articulated four specific reasons why reviewing such rulings would require an inappropriate degree of speculation.[10]

First, in limine rulings are preliminary and "subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the defendant's proffer."[11] The Court noted that this concern is particularly true regarding evidence of a criminal conviction because Federal Rule of Evidence 609(a)(1)(B) places a heightened burden on the prosecution, which must show that the probative value of the conviction outweighs its prejudicial effect.[12] Because it is difficult for a court to evaluate both the probative value and the prejudicial effect of proposed evidence in a factual vacuum, a preliminary ruling under Rule 609(a)(1)(B) is particularly likely to be reconsidered at trial.[13]

Second, "an accused's decision whether to testify 'seldom turns on the resolution of one factor,' [and] a reviewing court cannot assume that the adverse ruling

---

[10]     *Id.*

[11]     *Id.* at 41.

[12]     *Id.*; *compare* Fed. R. Evid. 609(a)(1) ("[F]or a crime that . . . was punishable by death or by imprisonment for more than one year, the evidence [of conviction] . . . must be admitted [for impeachment use] in a criminal case in which the witness is a defendant, if the probative value of the evidence outweighs its prejudicial effect to that defendant . . . ."), *with* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ."). In other words, under the Federal Rules of Evidence, any evidence may be excluded if its prejudicial effect *substantially outweighs* its probative value, but prior conviction evidence to impeach a defendant's credibility may be excluded if its prejudicial effect *equals or slightly outweighs* its probative value.

[13]     *Luce*, 469 U.S. at 41-42.

motivated a defendant's decision not to testify."[14] Though acknowledging that a defendant might make a commitment to testify in an offer of proof, the Court noted that "such a commitment is virtually risk free because of the difficulty of enforcing it."[15]

Third, a "reviewing court . . . has no way of knowing whether the Government would have sought to impeach with the prior conviction."[16] The Court noted that, particularly in cases where the Government's evidence is strong and where impeachment can be accomplished by other means, the prosecution may decide not to use contested evidence because of the increased risk of reversal on appeal.[17]

Finally, "[e]ven if these difficulties could be surmounted, the reviewing court would still face the question of harmless error."[18] The Court noted that if in limine rulings on the admissibility of prior conviction evidence for impeachment were reviewable on appeal, then "almost any error would result in the windfall of automatic reversal; the appellate court could not logically term 'harmless' an error that presumptively kept the defendant from testifying."[19] The Court feared that in the absence

---

[14]  *Id.* at 42 (quoting *New Jersey v. Portash*, 440 U.S. 450, 467 (1979) (Blackmun, J., dissenting)).

[15]  *Id.*; *see also* U.S. Const. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself . . . .").

[16]  *Luce*, 469 U.S. at 42.

[17]  *Id.*

[18]  *Id.*

[19]  *Id.*

of its preservation rule, defendants would introduce in limine motions "solely to 'plant' reversible error in the event of conviction."[20]

While *Luce* was decided on federal procedural grounds and was not binding on the states, we concluded in *Wickham* that "the justifications underlying the *Luce* rule apply with equal force to Alaska criminal practice."[21] We were further persuaded by the unanimity of the *Luce* decision and by the fact that a majority of state courts that subsequently addressed the issue adopted the *Luce* holding.[22]

---

[20]    *Id.*

[21]    *State v. Wickham*, 796 P.2d 1354, 1357 (Alaska 1990).

[22]    *Id.* Indeed, at least 27 other states and the District of Columbia have similarly adopted either *Luce*'s basic holding or an expanded version. *See State v. Allie*, 710 P.2d 430, 437 (Ariz. 1985) (en banc); *Smith v. State*, 778 S.W.2d 947, 950 (Ark. 1989); *People v. Collins*, 722 P.2d 173, 176-78 (Cal. 1986) (en banc); *State v. Harrell*, 506 A.2d 1041, 1046 (Conn. 1986); *Walker v. State*, 790 A.2d 1214, 1217-18 (Del. 2002); *Bailey v. United States*, 699 A.2d 392, 399-401 (D.C. 1997); *State v. Raydo*, 713 So. 2d 996, 997-1000 (Fla. 1998); *Warbington v. State*, 730 S.E.2d 90, 91-94 (Ga. App. 2012); *State v. Garza*, 704 P.2d 944, 948-49 (Idaho App. 1985); *People v. Patrick*, 908 N.E.2d 1, 10-11 (Ill. 2009); *State v. Derby*, 800 N.W.2d 52, 53-56 (Iowa 2011); *State v. Richmond*, 212 P.3d 165, 432-34 (Kan. 2009); *Hayes v. Commonwealth*, 58 S.W.3d 879, 881-82 (Ky. 2001); *State v. Gray*, 755 A.2d 540, 545 (Me. 2000); *Jordan v. State*, 591 A.2d 875, 877-79 (Md. 1991); *People v. Boyd*, 682 N.W.2d 459, 461-66 (Mich. 2004); *State v. Bruneau*, 552 A.2d 585, 592 (N.H. 1988); *State v. Brown*, No. 2091, 1992 WL 227940, at *1-2 (Ohio App. Sept. 16, 1992); *State v. Silvia*, 898 A.2d 707, 718-20 (R.I. 2006); *State v. Glenn*, 330 S.E.2d 285, 285-86 (S.C. 1985); *State v. Means*, 363 N.W.2d 565, 569 (S.D. 1985); *Jackson v. State*, 992 S.W.2d 469, 479-80 (Tex. Crim. App. 1999) (en banc); *State v. Gentry*, 747 P.2d 1032, 1036 (Utah 1987); *Reed v. Commonwealth*, 366 S.E.2d 274, 276-77 (Va. App. 1988); *State v. Brown*, 782 P.2d 1013, 1022-25 (Wash. 1989) (en banc); *State v. Honaker*, 454 S.E.2d 96, 107-08 (W.Va. 1994); *State v. Frank*, 640 N.W.2d 198, 202-04 (Wis. App. 2001); *Vaupel v. State*, 708 P.2d 1248, 1249-50 (Wyo. 1985). We are aware of only eight states that have rejected *Luce*'s holding. *See Commonwealth v. Crouse*, 855 N.E.2d 391, 397 (Mass. 2006)

(continued...)

## B.    Application Of The *Luce/Wickham* Rule In The Present Case

Although the holdings of *Luce* and *Wickham* were limited to preliminary rulings regarding evidence of a prior conviction, we conclude that the concerns articulated in *Luce* and *Wickham* apply in the present case.

First, as in *Luce* and *Wickham*, the contested ruling here was preliminary, and the superior court could have revisited its decision if the State had moved to introduce Wagner's statement at trial. While we acknowledge that evidence of a prior inconsistent statement is not subjected to the heightened admissibility burden for evidence of a criminal conviction,[23] all evidence must pass Alaska Evidence Rule 403's probative/prejudicial balancing test. Thus, at the time of the superior court's ruling, there remained a reasonable possibility that other evidence (such as Wagner's 911 call) could have been presented at trial and rendered Wagner's statement less probative than unfairly prejudicial. Indeed, such possibility is more likely in Alaska courts than in federal courts, because the burden for admitting evidence is heavier under Alaska Evidence Rule 403 than its federal counterpart.[24]

---

[22]    (...continued)
("presum[ing] . . . that a defendant who has not testified at trial may still challenge the denial of a motion to exclude evidence of a prior conviction" and declining to adopt *Luce*); *State v. Swanson*, 707 N.W.2d 645, 654 (Minn. 2006); *Warren v. State*, 124 P.3d 522, 526-28 (Nev. 2005); *State v. Whitehead*, 517 A.2d 373, 374-377 (N.J. 1986); *People v. Moore*, 548 N.Y.S.2d 344, 346 (App. Div. 1989); *State v. McClure*, 692 P.2d 579, 584 n.4 (Or. 1984) (en banc); *Commonwealth v. Richardson*, 500 A.2d 1200, 1203-04 (Pa. Super. 1985); *State v. Galmore*, 994 S.W.2d 120, 122-23 (Tenn. 1999).

[23]    *Compare* Alaska R. Evid. 613(a), *with* Fed. R. Evid. 609(a), *and* Alaska R. Evid. 609(c).

[24]    *Compare* Alaska R. Evid. 403 ("[R]elevant[] evidence may be excluded if its probative value is *outweighed* by the danger of unfair prejudice . . . ." (emphasis
(continued...)

Second, there is no way to determine whether Wagner would have testified if the superior court had granted his suppression motion. Wagner's suppression motion made no such indication, admitting that "[i]t is not known whether Mr. Wagner will choose to testify at trial." Wagner never filed an affidavit or other offer of proof asserting an intent to testify. And in his briefing to this court, Wagner does not suggest that he would testify at a retrial if we were to reverse his conviction.[25]

We also find it significant that Wagner failed to mention the suppression motion during the two *LaVigne* inquiries[26] the superior court held. During these inquiries, Wagner indicated that he had no questions for the court about testifying or not testifying. And at the end of the second inquiry, Wagner said he wished to waive his right to testify and that his waiver was not the result of any threat or promise. Wagner's failure to

---

[24]     (...continued)
added)), *with* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is *substantially outweighed* by a danger of . . . unfair prejudice . . . ." (emphasis added)).

[25]     Instead, Wagner argues that it is "entirely 'reasonable to presume' that a defendant who asks for an advance ruling in order to preclude the admission of the statement for impeachment purposes would have testified if his motion had been granted." We do not need to decide whether to adopt such a presumption, because Wagner equivocated in his suppression motion about whether he would testify. Thus even if we were to adopt this presumption, it would have been overcome here.

[26]     *See LaVigne v. State*, 812 P.2d 217, 222 (Alaska 1991) ("To avoid future cases such as LaVigne's, we believe that trial judges should take steps to insure that a criminal defendant's failure to take the stand in his or her own defense was the result of a knowing and voluntary decision made by the defendant. To accomplish this, we believe judges should make an on-the-record inquiry after the close of the defendant's case, although out of the jury's hearing, into whether a nontestifying defendant understands and voluntarily waives his right. Such action insures a valid waiver of the defendant's right. It will also assist in any subsequent appellate review of a defendant's claim to the contrary.").

mention the in limine ruling at the *LaVigne* inquiries is far from conclusive evidence that the ruling had no effect on his decision not to testify. However, these inquiries presented obvious opportunities for Wagner to state on the record that he would have testified in the absence of the threat of impeachment.

Third, we have no way to determine whether the State could or would have chosen to impeach Wagner with the contested statement if he had taken the stand. Wagner claimed in his motion to suppress that "there is little chance that Mr. Wagner will change his statement at trial." If this claim were true, then the State could not have used the contested statement for impeachment because there would have been no inconsistencies to impeach. And if Wagner's testimony at trial would have differed from his account on the night of murder, then the State would have been able to impeach Wagner's trial testimony using his 911 call instead of his statement to police.[27] Because this evidence was available for impeachment, the State might have declined to use the contested statement and reduced its risk of reversal on appeal.

Finally, conducting a harmless error analysis in this case would be impossible. Even if we were to conclude that the trial court's in limine ruling was erroneous, we could only speculate whether Wagner would have testified absent that ruling, how he would have testified, whether the State would have impeached that testimony, and what effect that impeachment would have had. If Wagner would not have testified regardless, or if the State would not have used the contested statement, there could be no harm. Even if we assume that Wagner would have testified, we do not know the substance of his testimony. So even if he could have been impeached with the contested statement, we cannot know whether that impeachment would have affected the jury.

---

[27]    At Wagner's sentencing hearing, the State used Wagner's 911 call for impeachment in addition to his statement to police.

For these reasons, we conclude that the concerns articulated in *Luce* and *Wickham* are present in this case. Nevertheless, Wagner presents several arguments why we should reach the merits of his underlying claim without regard to the speculation required in doing so. We find these arguments unpersuasive.

First, Wagner argues that the constitutionality of impeaching a defendant's testimony using statements obtained in violation of *Miranda* is a purely legal issue. Wagner is correct to the extent that it is a pure question of law whether the Alaska Constitution *ever* permits the State to impeach a defendant's testimony using evidence obtained in violation of *Miranda*.[28] But even if we were to reach this issue and decide it in Wagner's favor, the *Luce*/*Wickham* concerns would remain in full effect, and each of these concerns involves highly factual determinations. We would have no way to determine whether Wagner would have testified, whether the State could or would have impeached Wagner's testimony with the contested statement, and whether the impeachment would have been prejudicial. We do not rush forward to decide even purely legal issues in the abstract when it is impossible to determine whether a party suffered any actual harm.[29]

Next, Wagner argues that the superior court's in limine ruling threatened his constitutional right to testify. But although the right to testify is an important

---

[28]     Under the court of appeals' holding in *State v. Batts*, however, it is a mixed question of law and fact whether evidence obtained in violation of *Miranda* may be used for impeachment purposes in a particular case. *See* 195 P.3d 144, 158 (Alaska App. 2008) (prohibiting on constitutional grounds the impeachment use of statements obtained by "intentional" or "egregious" violations of *Miranda*). Unless we were to overturn *Batts*, our review of Wagner's claim would necessarily involve factual as well as legal questions.

[29]     *Cf. Bowers Office Prods., Inc. v. Univ. of Alaska*, 755 P.2d 1095, 1097-98 (Alaska 1988) ("[W]hile Alaska's standing rules are liberal this court should not issue advisory opinions or resolve abstract questions of law.").

constitutional guarantee,[30] that right is little more threatened in the present case than it is in other impeachment contexts. As the Michigan Supreme Court noted when it applied the *Luce* rule to a case also involving a *Miranda* claim,

> [T]he constitutional implications present in *Luce* . . . [are present in] every case in which a defendant alleges that a trial court's ruling effectively prevented him from testifying. . . . Any ruling, even if on a mere evidentiary issue, necessarily affects a defendant's constitutional rights if it has a chilling effect on the exercise of the right to testify.[31]

The court concluded, however, that this concern was outweighed by the *Luce* concern that appellate review not be based on hypothetical injuries and speculative harm.[32]

Similarly, in *Wickham*, we "recognize[d] that [the *Luce*] rule puts added pressure on the defendant to testify before a potentially prejudiced jury; the alternative being to [forgo] appeal of an in limine ruling which may be erroneous."[33] However, we noted that "the *Luce* rule ha[d] not been held to be violative of the federal constitutional

---

[30]    *See Rock v. Arkansas*, 483 U.S. 44, 49-53 (1987).

[31]    *People v. Boyd*, 682 N.W.2d 459, 464 (Mich. 2004).

[32]    *See id.* at 465-66. In addition to Michigan, at least four other jurisdictions have expressly extended *Luce*'s holding to claims involving impeachment evidence obtained in violation of *Miranda*. *See State v. Conner*, 786 P.2d 948, 953-54 (Ariz. 1990) (en banc); *Bailey v. United States*, 699 A.2d 392, 401-02 (D.C. 1997); *Jordan v. State*, 591 A.2d 875, 877-79 (Md. 1991); *State v. Bruneau*, 552 A.2d 585, 592-93 (N.H. 1988). In contrast, three states that have adopted *Luce* have expressly rejected its extension to this context. *See State v. Cherry*, 83 P.3d 123, 126 (Idaho App. 2003); *People v. Easley*, 592 N.E.2d 1036, 1048-49 (Ill. 1992); *State v. Brings Plenty*, 459 N.W.2d 390, 394-95 (S.D. 1990).

[33]    796 P.2d 1354, 1358 n.6 (Alaska 1990).

right against self-incrimination, and we perceive[d] no conflict with the Alaska Constitution."[34]

In addition to his right to testify argument, Wagner claims that the police interrogation in this case violated his right to due process and the privilege against self-incrimination. He contends that, absent the ability to appeal, he "loses all hope of vindicating [these] claim[s]."

But this argument ignores two judicial safeguards already provided to Wagner as well as an additional safeguard he declined to seek. First, the superior court dismissed the initial grand jury indictment against Wagner, which the State had obtained using the contested statement. The State was therefore required to seek a new indictment without the use of the contested evidence. Second, the superior court prohibited the State from introducing Wagner's statement to the jury at trial in its case in chief, so the jury never heard the statement. And third, nothing prevented Wagner from filing a petition for interlocutory review to the court of appeals after the superior court denied his suppression motion.[35] Though interlocutory review is "not a matter of right,"[36] such review is particularly appropriate in a case such as this, involving constitutional issues

---

[34]     *Id.*

[35]     *See* Alaska R. App. P. 402.

[36]     Alaska R. App. P. 402(b).

that would otherwise evade review.[37] Because these judicial safeguards were present, we disagree that Wagner was precluded from vindicating his constitutional claims.

Finally, Wagner argues that his testimony could have made a difference because the evidence at trial did not "overwhelmingly" prove his guilt. But this argument assumes not only that Wagner would have testified, but also that his testimony would have helped his case. We cannot possibly determine the validity of these assumptions on appeal, especially because Wagner has provided conflicting indications of how he might have testified. In the memorandum accompanying his suppression motion, Wagner claimed that there was "little chance" his testimony at trial — if he were to testify — would be inconsistent with his statement to the police. However, Wagner's testimony at his sentencing hearing was markedly different from the contested statement.[38] Because we cannot know how Wagner would have testified at trial we cannot evaluate whether his

---

[37] *See* Alaska R. App. P. 402(b)(4) ("Review . . . will be granted . . . where . . . [t]he issue is one that might otherwise evade review, and an immediate decision by the appellate court is needed for guidance or is otherwise in the public interest."); *see also Wickham*, 796 P.2d at 1358 n.6 (noting that in this situation "the defendant's apparent predicament is, to at least some extent, ameliorated by the availability of a petition for review of the *in limine* ruling in the court of appeals").

[38] Indeed, Wagner's testimony at his sentencing hearing was more consistent with the prosecution's narrative of events at trial than his trial argument in several key respects. Wagner conceded that an undated video of him standing outside Key's residence holding a gun was taken the day before the shooting and showed him holding the same gun used in the shooting. At trial, the defense had argued that the video was taken weeks before the shooting. Wagner also conceded that the audio from the videotape from the night of the shooting revealed that he had shown Key the handgun during his first visit to the mother-in-law unit. The defense had argued that the noises in the recording were inconclusive. And Wagner conceded that he shot Key as soon as Key entered the mother-in-law unit. In contrast, the defense repeatedly emphasized at trial that there might have been as many as 17 seconds between Key's arrival and the shooting.

possible testimony would have made any difference. And we decline to speculate about these issues in a factual vacuum.

On this record, we conclude that, by declining to testify, Wagner failed to preserve his *Miranda* claim for appellate review.

## V. CONCLUSION

We therefore AFFIRM the court of appeals' decision affirming Wagner's conviction.