678 S.E.2d 858

**Catherine I. SMITH and John Smith, Plaintiffs Below, Appellees**

v.

**Derek ANDREINI, M.D. and Orthopaedic Surgery, Inc., A Corporation, Defendants Below, Appellants.**

**No. 34271.**

Supreme Court of Appeals of West Virginia.

Submitted April 7, 2009.

Decided June 5, 2009.

Concurring and Dissenting Opinion of Justice Workman June 9, 2009.

Brent P. Copenhaver, Colombo & Stuhr, PLLC, Morgantown, for the Appellants.

Geoffrey C. Brown, Scott S. Blass, Bordas & Bordas, PLLC Wheeling, for the Appellees.

McHUGH, Justice:

Appellants Derek Andreini, M.D., and Orthopaedic Surgery Inc., defendants below,[1] appeal an order entered July 25, 2005, in the Circuit Court of Ohio County, West Virginia, which declared a mistrial upon a motion made by Appellees Catherine I. Smith and John Smith, her husband, plaintiffs below.[2] The ground for Mrs. Smith's oral motion for mistrial, made just after the jury retired for deliberations, was based upon remarks made by defense counsel during closing argument. At Mrs. Smith's request, the trial judge reserved its ruling on the motion until after the jury returned its verdict. The jury returned a verdict in favor of Dr. Andreini. Thereafter, the trial court scheduled a post-trial hearing on the motion for mistrial and, approximately twenty months after the verdict was rendered, declared a mistrial.

Upon careful review of the briefs, record, arguments of counsel, and applicable precedent, this Court holds that the July 25, 2005, order, is reversed.

I. Factual and Procedural Background

On February 25, 2000, Dr. Andreini, an orthopedic surgeon, performed rotator cuff repair surgery on Mrs. Smith's right shoulder.[3] On March 30, 2000, Dr. Andreini per-

---

1. Hereinafter, Appellants will be collectively referred to as "Dr. Andreini."

2. Hereinafter, Appellees will be collectively referred to as "Mrs. Smith."

3. Several months earlier, Mrs. Smith had suffered a fall and sustained an injury to her right shoulder.

formed a second procedure known as "manipulation under anesthesia" (hereinafter "manipulation procedure") the purpose of which was to break up adhesions that had developed on Mrs. Smith's shoulder following the first surgery.

Within hours after Mrs. Smith was released from the hospital following the manipulation procedure, Mrs. Smith's friend[4] telephoned Dr. Andreini to advise him that Mrs. Smith was experiencing numbness in her shoulder and was unable to move it. It is undisputed that Dr. Andreini advised Mrs. Smith to proceed immediately to the emergency department and that he would meet her there. What transpired once Mrs. Smith arrived at the emergency department was much disputed at trial.

Dr. Andreini contends that he met Mrs. Smith at the emergency department on March 30, 2000, and that he, along with Dr. Jeffrey Ruben, an emergency medicine specialist, and Dr. Srini Govindin, a neurologist, examined her there. According to hospital emergency department records he completed following his examination of Mrs. Smith, Dr. Andreini noted, *inter alia*, that Mrs. Smith "has a discomfort within the shoulder. It is mildly swollen, not red or hot. Placing the shoulder through a gentle range of motion showed a normal glenohumeral articulation and relationships." Dr. Andreini's notes further indicated that Mrs. Smith had "a wrist drop" and was unable to extend her fingers, but that "she was able to flex and extend her elbow, and initiate abduction and adduction of the humerus." Dr. Andreini also indicated that Mrs. Smith complained of "numbness in the entire humerus, forearm, and hand over the palmar and dorsal surfaces" and that Dr. Andreini reevaluated her after she underwent lab studies. Dr. Andreini concluded the report with the following notation: "I placed her in a cock-up wrist splint in order to hold the wrist in extension. The patient was also placed in a sling. She is to be seen by Dr. Govindan, a neurologist, tomorrow as well as reevaluation by myself."

It is Mrs. Smith's contention, however, that although Dr. Andreini advised her by telephone that he would meet her at the emergency department, he never arrived. Mrs. Smith testified that, consequently, Dr. Andreini must have falsified the above-described hospital records in which he personally recounted his examination and treatment of Mrs. Smith during her emergency department visit. Additionally, when confronted at trial with Dr. Andreini's contention that it was he who placed Mrs. Smith's wrist in a splint during her visit to the emergency department, Mrs. Smith stated that although she did not recall who placed the splint on her wrist, it was not Dr. Andreini.[5]

The contrasting testimony regarding whether Dr. Andreini examined Mrs. Smith at the emergency department hours after the manipulation procedure was critical to Mrs. Smith's medical malpractice claim against Dr. Andreini. Dr. Andreini diagnosed Mrs. Smith with a dislocated shoulder on April 3, 2000, during her second post-procedure office visit (four days after the manipulation procedure). It is Mrs. Smith's contention that Dr. Andreini *caused* the shoulder dislocation *during* the manipulation procedure and then failed to timely diagnose it. Mrs. Smith argued that the dislocation of her shoulder caused traction, or stretching, on the brachial plexus nerve, which continued for the four days following the manipulation procedure until it was finally diagnosed and treated by Dr. Andreini in his office on April 3, 2000. Indeed, it is undisputed that Mrs. Smith suffered a severe loss of shoulder function following the manipulation procedure as a result of brachial plexus neuropathy. However, at trial, Dr. Andreini contended that when he and Drs. Ruben and Govindan examined Mrs. Smith in the emergency depart-

---

**4.** Mrs. Smith's friend, Carol Anderson, had transported Mrs. Smith to and from the hospital procedure earlier that day.

**5.** Mrs. Smith testified that she was "upset" by the fact that Dr. Andreini did not meet her at the emergency department as promised. However, she further testified that she never mentioned to him his absence in the emergency department at her office visit with him the following day. Finally, Mrs. Smith testified (and medical records confirmed) that she continued to be treated by Dr. Andreini for at least another eighteen months (and up until approximately six months prior to trial in this case).

ment on March 30, 2000, the shoulder was *not* dislocated. Rather, according to Dr. Andreini, the dislocation causing the brachial plexus neuropathy occurred not during the manipulation procedure, but *following* it— that is, between Mrs. Smith's first post-procedure office visit with Dr. Andreini on March 31, 2000 (the day after the manipulation procedure), and April 3, 2000, Mrs. Smith's second post-procedure office visit with Dr. Andreini (when the dislocation was diagnosed).[6]

The parties agree that following the presentation of the evidence, it became apparent that the credibility of the witnesses would play a significant role in the jury's determination of liability. Among other things, the parties presented very different versions of Mrs. Smith's emergency department visit on March 30, 2000, and argued different theories as to when Mrs. Smith's shoulder became dislocated and, consequently, when a timely diagnosis should have occurred. During closing arguments, Dr. Andreini's counsel attempted to emphasize these differences and, in so doing, elicited an objection by Mrs. Smith. According to Dr. Andreini's brief, Mrs. Smith's counsel implied during the initial portion of his closing argument that Dr. Andreini's defense expert, orthopedic surgeon Dr. Mark Rodosky, had not been truthful at trial because he had been impeached with the transcript of his pretrial deposition. In response, Dr. Andreini argues that his counsel made the following remark during his own closing argument, to which Mrs. Smith's counsel objected:

> Dr. Andreini's counsel: So I think, Ladies and Gentlemen, all of these things speak to the qualifications of the experts that the parties on both sides brought before you, to tell you about shoulder surgery and

shoulder manipulations and how you do them.

> On the other hand, if you had a shoulder injury, and you were concerned about your ability to make a living, couldn't work, couldn't sleep at night, and it goes on and on and on for several months, would you be pleased to have the benefit of Dr. Rodosky's training and expertise, or is he the big fat liar that Mr. Blass [Mrs. Smith's counsel] says he is?
> Mr. Blass: Your Honor, I object to that statement, I don't believe I used the words "Big, fat liar."
> Dr. Andreini's counsel: Folks, I'm from Lake Charles Louisiana—
> Mr. Blass: I don't care where he's from, I don't think that it is appropriate, and I object.
> Dr. Andreini's Counsel: I'm from Lake Charles, Louisiana, and you know, that doesn't matter, but where I come from, we call things the way we see them. And I'm here to tell you that not only has Mr. Blass repeatedly impugned my client's integrity and truthfulness, you pick a word, any word you want, and you pick a good word you can say about a human being, and he has done the opposite. And he has also done that to Dr. Rodosky.[7]

(Footnote added.)

After the jury retired to the jury room for deliberations, counsel for Mrs. Smith orally requested a mistrial based upon the above-described remarks by Dr. Andreini's counsel. At the request of Mrs. Smith's counsel, however, the trial court deferred its ruling on the motion for mistrial until after the jury returned a verdict. The jury returned a verdict in favor of Dr. Andreini.

A hearing on the motion for mistrial was scheduled for February 6, 2004.[8] Prior

---

6. A second issue raised at trial was that of informed consent. The parties agreed that brachial plexus neuropathy is a known complication that might occur in patients who undergo manipulation of the shoulder even absent medical negligence. At trial, the parties did not agree, however, as to whether Dr. Andreini properly informed Mrs. Smith of this possible complication.

7. The trial judge did not rule on this objection, nor did Mrs. Smith's counsel request a curative instruction.

8. Following the trial and prior to the February 6, 2004, hearing, Mrs. Smith requested and was provided with a transcript of the closing argument of Dr. Andreini's counsel. No additional transcripts were requested by either party at that time.

 After the trial court entered the order declaring a mistrial, by letter dated August 23, 2005, from Brent Copenhaver, Dr. Andreini's counsel, to The Honorable Martin J. Gaughan, Chief Judge, Dr. Andreini's counsel requested tran-

thereto, on or about December 11, 2003, Mrs. Smith filed Plaintiffs' Memorandum in Support of Motion for Mistrial, arguing that the motion for mistrial should be granted not based upon the objected-to remarks by Dr. Andreini's counsel, as described above, but instead, on the ground that Dr. Andreini violated an *in limine* order entered just prior to trial. In that order, entered November 12, 2003, the trial court, *inter alia,* had granted "Defendants' motion *in limine* to prohibit plaintiff's counsel from commenting or making personal attacks on the character or truthfulness of defense counsel in the presence of the jury." [9] (Footnote added.)

In her Memorandum, Mrs. Smith acknowledged she raised "genuine credibility issues" concerning whether Dr. Andreini examined her in the emergency department. However, Mrs. Smith asserted that certain remarks made by Dr. Andreini's counsel during closing argument (including but not limited to the remarks to which Mrs. Smith objected at trial and upon which the original motion for mistrial was made) mischaracterized Mrs. Smith's arguments and made false accusations against Mrs. Smith's counsel, all in violation of the *in limine* order. For example, Mrs. Smith argued that during closing argument, Dr. Andreini's counsel improperly stated:

> It's not enough for the plaintiffs to come into this courtroom and have a legitimate difference of opinion with Dr. Andreini in regard to whether he was responsible for this nice lady's injuries. That's not enough.
>
> No, they have to tell you that he is a lying, cheating, loathsome, despicable human being.
>
> Let's face it, be honest, that is precisely what you just heard.

Mrs. Smith's Memorandum also argued the *in limine* order was violated by various other remarks made by Dr. Andreini's counsel, including the following: [10]

> Was Dr. Andreini in the emergency room? If the doctor is the reprehensible human being that they say he is, you should decide he wasn't there, he lied to you, he committed fraud and he made up that note.
>
> Dr. Ruben told you that Dr. Andreini put that splint on and that sling. He told

scripts of additional portions of the trial for preparation of this appeal—namely, the trial testimony of Mrs. Smith, and "[t]he entire closing argument of both counsel for the plaintiffs and counsel for the defendants, including any discussion out of the presence of the jury during or after the closing argument that in any way related to the plaintiffs' objection to the defendants' closing argument or the plaintiff's motion for mistrial." Thereafter, Dr. Andreini's counsel learned that the trial judge's court reporter had died sometime after the November 2003, trial in this case. The trial judge's new court reporter was eventually able to transcribe Mrs. Smith's trial testimony, as requested by Dr. Andreini's counsel. Unfortunately, however, the new court reporter was unable to also transcribe the remaining portions requested by Dr. Andreini's counsel due to technical difficulties involving the electronic formatting of the original court reporter's trial notes. Finally, in a March 6, 2008, letter to Dr. Andreini's counsel signed by both the trial judge and his secretary, they indicated that after a "diligent, exhaustive search of audio tapes and paper notes" from the home of the judge's deceased court reporter and at the courthouse, they "cannot identify any audio tapes of [Mrs. Smith's counsel's] closing argument. At this time I[sic] know of no other place that we could look to find the tape of [his] closing argument."

9. On its face, the language of the *in limine* order prohibited *Mrs. Smith's* counsel "from commenting or making personal attacks on the character or truthfulness of" *Dr. Andreini's* counsel in the presence of the jury, and not vice versa. However, in the July 25, 2005, order now on appeal, the trial court interpreted the order to apply to both parties, stating, *inter alia,* that "the Court granted a Motion in Limine filed in an omnibus motion which the Court stated applied to both parties. Part 'K' of the Motion prohibited counsel for both parties from commenting or making personal attacks on the character or truthfulness of each other in the presence of the jury."

10. We are particularly mindful that the majority of the remarks about which Mrs. Smith complained in her written memorandum in support of her motion for mistrial and in her brief before this Court were not presented in their full context. We believe that consideration of the issue presented in this appeal clearly requires that the complained-of remarks be reviewed in the context in which they were made so that they can be more easily understood and more fairly addressed. Accordingly, we have included herein those remarks of Dr. Andreini's counsel in their proper context.

you three times he remembered seeing him in the emergency room that very day.

When Dr. Andreini dictated that note the next morning at 8:10, he didn't know Mrs. Smith had a dislocation, because she didn't have one.

Why would Dr. Andreini the next morning dictate a fraudulent note? What in the world would possess him to do it at that time? What would be his motive?

Because, gee, he was thinking to himself, what, maybe she will develop over the next year this permanent, serious, devastating injury and maybe I need to protect myself and lie about whether I was in the emergency room?

Now Mr. Blass tells you it doesn't matter whether he was there or not.

Oh, yes, it does. He told you in his opening statement that it was a big fat lie, that he wasn't there, and he is lying about it, and he didn't examine her shoulder.

You know what? It does matter because he was there and he did examine her shoulder, and he specifically looked for evidence of a dislocation and it wasn't there.

So it is okay to get up in opening and accuse this man of being a liar and a cheat and a fraud, and then when you get caught, and you can't prove it, say, well, it doesn't really matter. That's fair?

Mrs. Smith has remained under Dr. Andreini's care for three years, despite the fact that, according to Mr. Blass, Dr. Andreini caused her a permanent, devastating injury. Dr. Andreini has left her unable to work, Dr. Andreini has ruined her life. Remember, now, the testimony of the family—and I believe them, by the way, she's not the same person she was. He has ruined her life. Caused her to have chronic depression. No dispute about that, either. Believes he's totally incompetent. Sued him. Believes he created a fraudulent medical record, and yet she's remained under his care for three years.

What does your common sense tell you about Mr. Blass's claims about my client, his character and his integrity, who he is as a human being.

Is that what patients do who believe their doctor did all of those things to them? Is that what you would do? Doctor, you're such a despicable jerk, I'm going to continue coming back to your office for three years, despite everything you have done to me, all the lies and all the cheating and all the fraud, you ruined my life, but I'm going to keep coming back and I'm going to keep coming back.

It was also argued that the following comments by Dr. Andreini's counsel attacked the credibility of Mrs. Smith's counsel while attempting to bolster his own:

I'm also, like Mr. Blass, an officer of this court. I have a duty to His Honor, to you, and to the system of justice that I represent along with Mr. Blass. I have a duty not to lie to you, not to deceive you, or mislead you.

My job, I think, is to try to persuade you that my client rendered appropriate medical care to Mrs. Smith. That's all.

And I don't get paid to get up here and try to hoodwink you. I don't get paid to get up here and try to deceive you, pull the wool over your eyes. Use any expression you like. And I don't want to do that."

Finally, Mrs. Smith's counsel argued the following remarks by Dr. Andreini's counsel, the last paragraph of which Mrs. Smith characterized as "sarcastic," also violated the *in limine* order:

I am not and I will not accuse anyone on their side of lying to me. I will, however, suggest to you that our memories as human beings are not infallible.

Ladies and Gentlemen, for Mr. Blass to get up here and suggest to you that Dr. Andreini was the only one who had his deposition displayed in front of you, he is the only one that changed his testimony, you know better. Every single witness that took the stand was confronted with deposition testimony. Both sides of the fence. The reason we do that is because human memory isn't infallible. Because people forget what they maybe said previously. Under oath or not. You can't be subjected to a three-or four-hour deposition and be expected six months later or a year later or two years later, whether it is

their expert witness, Dr. Danaceau or not—you will recall I put up his testimony, too, to demonstrate what he told us at his deposition was different than what he told you here. That is not to say that he either lied then or he is lying now. What it does say is his testimony was inconsistent, and it is for you to decide what weight to give to that testimony.

That is all. Not that Dr. Danaceau came here to lie to you. He didn't. He did not. Dr. Govindan didn't come here to lie to you, Mrs. Smith didn't come here to lie to you. Apparently every one of our witnesses did.

This guy Rodosky [Dr. Andreini's medical expert] had nothing better to do in his life, his professional life, than to come to Wheeling, West Virginia, to flat out lie to you. Apparently had a day where he didn't have anything to do, and so he thought he would come here and just fib to us.

Approximately twenty months after the motion for mistrial was originally made and a defense verdict rendered, and more than seventeen months after the February 6, 2004, hearing on the motion, the trial court declared a mistrial. In its order entered July 25, 2005, the court found, *inter alia,* that

Defense counsel went beyond the scope of proper argument by grossly mischaracterizing Plaintiff's closing argument and by injecting harsh and vituperative remarks. Specifically, he falsely accused Plaintiffs as describing Dr. Andreini as a big fat liar, a cheat, a fraud, and a despicable human being. Furthermore, defense counsel personally attacked plaintiff's counsel and suggested that he was lying and being deceitful. This Court feels the only proper remedy is to declare a mistrial.

Relying on syllabus point 5 of *Honaker v. Mahon,* 210 W.Va. 53, 552 S.E.2d 788 (2001), the trial court's order declaring a mistrial found that Dr. Andreini violated the *in limine* order:

"[A] deliberate and intentional violation of a trial court's ruling on a motion in limine, and thereby the intentional production of prejudicial evidence into a trial, is a ground for reversal of a jury verdict."

There is no doubt the violation of this order was deliberate. After all the motion was brought by defendant in the first place. Certainly, Defendant was aware of the order and the scope.

The trial court also relied on syllabus point 2 of *State v. Kennedy,* 162 W.Va. 244, 249 S.E.2d 188, 189 (1978), stating " 'that great latitude is allowed counsel in the argument of cases is an established rule. It is well settled, however, that counsel must keep within the evidence and not make statements calculated to inflame the minds of jurors intending to introduce verdicts warped by prejudice.' " The trial court further determined that " 'vituperative remarks of counsel in argument before the jury are improper and may be sufficient cause for setting aside a verdict favorable to the party represented by such counsel.' " (*quoting* Syl. Pt. 6, *Slaven v. Baltimore & Ohio R.R. Co.,* 114 W.Va. 315, 316, 171 S.E. 818 (1933)).

It is from the July 25, 2005, order declaring a mistrial that Dr. Andreini now appeals.

## II. Post–Trial Order Declaring Mistrial and Appellate Jurisdiction

The singular issue in this appeal is whether the trial court committed error in declaring a mistrial. However, before we address the merits of the court's ruling, we must consider first, the procedural propriety of the trial court's decision to defer ruling on Mrs. Smith's motion for a mistrial until after the jury rendered its verdict in favor of Dr. Andreini and second, this Court's appellate jurisdiction to review the trial court's July 25, 2005, order.

In *Vilar v. Fenton,* 181 W.Va. 299, 382 S.E.2d 352 (1989), this Court recognized that " '[a] motion for a mistrial is a procedural tool whetted and honed for use during the trial to cut it short for legal reasons which preclude a verdict and entering a judgment that cannot possibly stand. It can therefore be utilized only as a pre-verdict motion and not a post-verdict or post-trial motion.' " 181 W.Va. at 300, 382 S.E.2d at 353 (*quoting Williams v. Deasel,* 19 Ill.App.3d 353, 311 N.E.2d 414, 415 (1974)). In *Vilar,* plaintiffs filed suit against defendant, challenging the validity of the will and power of attorney

executed by the decedent. Following a two-day trial, the jury found the will invalid. Defendant filed a motion for new trial pursuant to Rule 59 of the West Virginia Rules of Civil Procedure.[11] During a post-trial hearing, plaintiffs' counsel advised the court that plaintiffs were related to a person who, several years earlier, had filed an ethics complaint against the trial judge while he was a practicing attorney. Thereafter, the trial judge, *sua sponte*, declared a mistrial, recused himself from the case, and transferred further proceedings in the case to another judge. On appeal, this Court determined, *inter alia*, that the trial court committed error by declaring a mistrial *after* the jury had reached a verdict and held that "[p]rior to the entry of the verdict by a jury, a mistrial is procedurally possible; however, declaring a mistrial after the jury verdict is rendered is improper." Syllabus, *Vilar*, 181 W.Va. at 299, 382 S.E.2d at 352. *See Howell v. Davis*, 278 S.C. 510, 299 S.E.2d 336, 337 (1983) ("[a] mistrial is granted in a case in which the jury is discharged without a verdict; a motion for new trial is made after a judgment has been rendered. Granting a mistrial was inappropriate after the jury returned its verdict." (citations omitted)) and *Williams v. Deasel*, 19 Ill.App.3d 353, 311 N.E.2d 414, 415 (1974) ("[T]he commonly accepted concept of the mechanics of a mistrial is that when a mistrial is declared and the jury is discharged, the trial is terminated and is begun again over on another day. Its mechanical and its legal performance is impossible after verdict, judgment, and discharge of the jury").

Though procedurally incorrect, the trial court declared a mistrial after the jury verdict had been rendered in favor of Dr. Andreini, thereby setting aside the verdict and ordering a new trial. As we explained in *Vilar*, there is a traditional distinction between an order declaring a mistrial and an order granting a motion for new trial:

A mistrial and a new trial are not the same thing in name or effect. There is a marked difference between a court's grant-ing a motion for a new trial and declaring a mistrial; the former contemplates that a case has been tried, a judgment rendered, and on motion therefor said judgment set aside and a new trial granted, while the latter results where, before a trial is completed and judgment rendered, the trial court concludes that there is some error or irregularity that prevents a proper judgment being rendered, in which event a mistrial may be declared. A mistrial is a matter of law, while a new trial results from the exercise of discretion; a mistrial is a nugatory trial, while a new trial recognizes a completed trial which for sufficient reasons has been set aside so that the issues may be tried or litigated de novo.

181 W.Va. at 300, 382 S.E.2d at 353 (*quoting* 66 C.J.S. New Trial 1(c) (1962)).

In addition to the foregoing, an even more important distinction between an order declaring a mistrial and an order granting a new trial is this Court's jurisdiction to review such orders on appeal. In syllabus point 1 of *James M.B. v. Carolyn M.*, 193 W.Va. 289, 456 S.E.2d 16 (1995), we emphasized that

[a] court of limited appellate jurisdiction is obliged to examine its own power to hear a particular case. This Court's jurisdictional authority is either endowed by the West Virginia Constitution or conferred by the West Virginia Legislature. Therefore, this Court has a responsibility *sua sponte* to examine the basis of its own jurisdiction.

Thus, although not raised by either party herein, this Court is obliged to determine its jurisdictional authority over the case *sub judice*:

Where neither party to an appeal raises, briefs, or argues a jurisdictional question presented, this Court has the inherent power and duty to determine unilaterally its authority to hear a particular case. Parties cannot confer jurisdiction on this

---

**11.** Rule 59(a) of the West Virginia Rules of Civil Procedure provides, in pertinent part:

 A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law[.]

Court directly or indirectly where it is otherwise lacking.
*James M.B.*, 193 W.Va. at 291, 456 S.E.2d at 18, syl. pt. 2.

 In past cases, we have affirmed that "[g]enerally, this Court in its appellate capacity only has jurisdiction over final decisions of the circuit court[,]" pursuant to W.Va.Code § 58–5–1(1998) (Repl.Vol.2005),[12] or if an order " 'fall[s] within a specific class of interlocutory orders which are made appealable by statute or by the West Virginia Rules of Civil Procedure, or . . . fall[s] within a jurisprudential exception.' " *Gooch v. W.Va. Dept. of Public Safety*, 195 W.Va. 357, 362, 363, 465 S.E.2d 628, 633, 634 (1995)(*quoting James M.B. v. Carolyn M.*, 193 W.Va. 289, 292–93, 456 S.E.2d 16, 19–20 (1995).).[13] An order declaring a mistrial is not a final order nor does it fall either within the class of interlocutory orders made appealable by statute or the rules of civil procedure or within a jurisprudential exception. *See Bernat v. Handy Boat Service, Inc.*, 239 A.2d 651, 652 (Me.1968) ("[T]he granting of a mistrial automatically produce[s] a new trial and the case was not ripe for appellate review at that stage"); *Carlson v. Locatelli*, 109 Nev. 257, 849 P.2d 313, 314 (1993) (" '[o]rders granting a mistrial . . . are not final' and . . . not appealable." (*quoting* 15B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure*, § 3915.1 (1992)); *Hairlox Co., Inc. v. McDonald*, 557 A.2d 163, 164 (D.C.App.1989) ("An order granting a civil mistrial is not an appealable final order"); *Yaeger v. Vance*, 20 Ariz.App. 399, 513 P.2d 688, 689 (1973) ("[A]n order granting a mistrial is not an appealable order under" Arizona statute); *In re Taylor's Will*, 271 A.D. 947, 67 N.Y.S.2d 823, 825 (N.Y.App.Div.1947) ("An appeal does not lie from an order granting a mistrial"); *Yon v. Yarus*, 700 A.2d 545, 546 (Pa.Super.1997) ("The grant of a mistrial is not an appealable order"); and *Matter of S.G., Jr.*, 935 S.W.2d 919, 923 (Tex.App.1996) (Appellate court "lacks jurisdiction to review a trial court order granting a motion for mistrial"). Thus, an order declaring a mistrial is not an appealable order.

 Although an order declaring a mistrial is not appealable to this Court, a post-trial order granting a new trial[14] is. This Court has determined that its "jurisdiction to consider interlocutory appeals of orders granting a new trial is encompassed within the authority granted under the state constitution for appellate review of both cases of law and cases of equity. W.Va. Const. Art. VIII, § 3." *Wolfe v. Welton*, 210 W.Va. 563, 573, 558 S.E.2d 363, 373 (2001). *See Foster v. Sakhai*, 210 W.Va. 716, 724, 559 S.E.2d 53, 61 (2001) (the "inherent power of the judiciary . . . gives [it] the authority to hear the appeal of an order granting a new trial.") Thus, in syllabus point 6 of *Foster*, we held, in pertinent part, that "[o]ne may appeal to this Court a circuit court's order granting a new trial and one may appeal such an order without waiting for the new trial to be had."[15] (Footnote added.)

---

**12.** W.Va.Code § 58–5–1 (1998) provides, in pertinent part, that "[a] party to a civil action may appeal to the Supreme Court of Appeals from a final judgment of any circuit court[.]"

**13.** *See e.g. James M.B.*, 193 W.Va. at 292–93 nn. 3 and 4, 456 S.E.2d at 19–20 nn. 3 and 4 (outlining the types of orders which have been made appealable by statute, the rules of civil procedure and jurisprudential exception); Syl. Pt. 2, *State ex rel. McGraw v. Telecheck Services, Inc.*, 213 W.Va. 438, 440, 582 S.E.2d 885, 887 (2003) (holding that Art. VIII, § 3 of W.Va. Const. "includes a grant of jurisdiction to hear appeals from interlocutory orders by circuit courts relating to preliminary and temporary injunctive relief"); and Syl. Pt. 6, *Wolfe v. Welton*, 210 W.Va. 563, 566, 558 S.E.2d 363, 366 (2001) (holding that this Court has "jurisdiction to hear an appeal from a circuit court judgment reversing the judgment of the magistrate court in a matter heard there on the merits, notwithstanding the fact that the circuit court order also undertakes to remand the case to the magistrate court for a new trial or other proceedings").

**14.** *See generally* W.Va.R.Civ.Pro. 59 ("New trials; amendments of judgments") and 60 ("Relief from judgment or order").

**15.** The remaining portion of syllabus point 6 of *Foster* states: "To the extent that our previous cases such as *James M.B. v. Carolyn M.*, 193 W.Va. 289, 456 S.E.2d 16 (1995), *Coleman v. Sopher*, 201 W.Va. 588, 499 S.E.2d 592 (1997), and their progeny suggest otherwise, they are hereby distinguished." *James M.B.*, which we rely on in the case *sub judice*, discussed the "finality rule" and ultimately concluded that because the lower court never ruled on a West

Thus, this Court has appellate jurisdiction over an order granting a new trial, but is not vested with such authority over an order declaring a mistrial. In *Carlson,* the trial court declared a mistrial *after* the jury awarded $160,000.00 in damages to the plaintiff, who was injured while on defendant's premises, on the ground the jury completed the general verdict form but failed to also complete the special verdict form pursuant to the court's instructions. Upon distinguishing a mistrial from a new trial in a manner similar to this Court's decision in *Vilar, supra,* the Supreme Court of Nevada also recognized that " '[g]ranting a mistrial is generally inappropriate after the jury returns a verdict, *although such an action might be considered by an appellate court to be equivalent to an order setting aside the verdicts and ordering a new trial.*' " 849 P.2d at 315 (*quoting* 58 Am.Jur.2d New Trial § 10 (2d ed.1989) (emphasis added)).[16] Indeed, the court in *Carlson* concluded that although the lower court's order was "captioned an order declaring a mistrial, the district court's order was clearly one granting a new trial. When the order was issued, both verdicts had been returned and the trial had been concluded. The order was also issued subsequent to a motion and hearing following the conclusion of the trial. Since an order granting ... a new trial is appealable under [the Nevada Rules of Appellate Procedure], we have jurisdiction over this appeal." 849 P.2d at 315.

In *State ex rel. Sebers v. McNulty,* 326 So.2d 17 (Fla.1975), a criminal defendant filed a motion for mistrial during the course of his trial. The trial judge reserved ruling on the motion. Five days after a guilty verdict was rendered, the judge held a hearing on the motion and set aside the jury verdict. The court in *McNulty* determined that "[a]lthough the motion was denominated a motion for mistrial, correctly labeled at the time it was made during the course of trial, it was in legal effect when ruled upon[,] a motion for new trial. As such, the order [grant-

ing the new trial] was appealable." 326 So.2d at 18. *See Johnson v. Frazier,* 787 A.2d 433, 435 (Pa.Super.2001) ("While the trial court granted what it termed a mistrial, it could not do so because the trial was already over. The effect of a declaration of a mistrial is to end the trial, and it is procedurally illogical to terminate a trial that has already ended. *The order was, in actuality, one for a new trial because it followed the recording of the verdict, and we review it as such.*" (emphasis added)).

Accordingly, we hold that an order declaring a mistrial is not an appealable order; however, an order granting a motion for new trial is an appealable order. When a court improperly grants an order declaring a mistrial after the conclusion of a trial and after a verdict has been rendered, this Court may consider such an order to be an order granting a new trial, which is appealable to this Court.

In the instant case, Mrs. Smith's counsel timely filed a motion for mistrial during the course of the trial. However, Mrs. Smith's counsel requested that the trial court reserve its ruling until after the jury returned a verdict. The trial court obliged and did not immediately rule on the motion. After the jury reached a verdict in favor of Dr. Andreini, the parties eventually filed post-trial memoranda in support of their respective positions. Approximately three months after the trial was concluded and a verdict rendered, the court conducted a hearing on the mistrial motion. Ultimately, the court granted Mrs. Smith's motion for mistrial and in its July 25, 2005, order, concluded that "[t]his is a Final Order and Defendant shall have the opportunity to test this Court's Order before the West Virginia Supreme Court of Appeals before retrying the case." We find that although the trial court characterized the July 25, 2005, order as an order granting mistrial, the court, in reality, awarded Mrs. Smith a new trial. Accordingly, we

---

Virginia Rule of Civil Procedure 59(e) motion to alter or amend the judgment, the order was not a final, appealable judgment. To the extent we rely on *James M.B.* and *Gooch* (one of its progeny) in this opinion, there is no conflict with our discussion and holding herein.

**16.** In *Vilar,* this Court did not explore the procedural possibility of treating an order declaring a mistrial as an order granting a new trial.

shall consider the July 25, 2005, order to be an order granting a new trial.[17]

### III. Standard of Review

 In reviewing the trial court's order granting a new trial, we are guided by the following standard of review:

"Although the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence." Syl. pt. 4, *Sanders v. Georgia–Pacific Corp.*, 159 W.Va. 621, 225 S.E.2d 218 (1976).

Syl. Pt. 1, *Foster v. Sakhai*, 210 W.Va. 716, 559 S.E.2d 53 (2001).

### IV. Discussion

 In its July 25, 2005, order, the trial court concluded that the previously-described remarks of Dr. Andreini's counsel during his closing argument were improper and required that the jury verdict be set aside and a new trial ordered.

 In theory, this Court affords trial courts considerable latitude in determining the propriety of argument by trial counsel. As we held in syllabus point 9 of *Foster*, 210 W.Va. at 720, 559 S.E.2d at 57,

"The discretion of the trial court in ruling on the propriety of argument by counsel before the jury will not be interfered with by the appellate court, unless it appears that the rights of the complaining party have been prejudiced, or that manifest injustice resulted therefrom." Syl. pt. 3, *State v. Boggs*, 103 W.Va. 641, 138 S.E. 321 (1927).

In considering the propriety of the remarks made by Dr. Andreini's counsel during his closing argument and challenged by Mrs. Smith in this case, common sense dictates that such remarks be reviewed not in isolation but in the context in which they were made. Only then can it be determined whether "the rights of the complaining party have been prejudiced, or that manifest injustice resulted therefrom." Syl. Pt. 9, *Foster*, 210 W.Va. at 720, 559 S.E.2d at 57. *See Engle v. Liggett Group, Inc.*, 945 So.2d 1246, 1272 (Fla.2006) ("To determine whether the challenged statements and arguments were in fact prejudicial, the statements cannot be evaluated in isolation but must be placed and evaluated in context").

This Court has carefully reviewed Dr. Andreini's counsel's closing argument in its entirety. *See* n. 10, *supra*. We find that the vast majority thereof consisted of a traditional summation of the evidence. We recognize, however, that, as described previously, counsel's argument also included several sarcastic remarks and hyperbole.[18] To a reasonable

---

**17.** In this case, Mrs. Smith made a timely motion for mistrial, but requested that the trial judge defer its ruling on the motion until a verdict was rendered. The trial judge acquiesced and, some twenty months after the verdict was rendered in favor of Dr. Andreini, granted Mrs. Smith's motion. We advise both lawyers and trial courts that a motion for mistrial should be made with the expectation that it be ruled upon expeditiously—that is, at the very least, shortly after such a motion is made and, at the most, prior to the conclusion of the trial and the rendering of a verdict. *See Vilar*, 181 W.Va. at 300, 382 S.E.2d at 353 (a mistrial " 'results where, *before* a trial is completed and judgment rendered, the trial court concludes there is some error or irregularity that *prevents a proper judgment being rendered* [.]' " (internal citation omitted) (emphasis added)). We appreciate the experience and knowledge of both the trial judge and Mrs. Smith's counsel in this case; however, they have placed this Court in the less than desirable position of having to consider an order declaring a mistrial

improperly entered after a verdict is reached as an order granting a motion for new trial. As discussed above, an order declaring a mistrial is not an appealable order. Thus, if this Court does not consider the trial court's improperly-entered order declaring a mistrial as an order granting a new trial, it would not have jurisdiction over this appeal and, as a result, Dr. Andreini would be unfairly prejudiced.

**18.** As previously noted, Mrs. Smith objected to only one of the previously-described comments made by Dr. Andreini's counsel during his closing argument. The grounds for the objection, in essence, was that Dr. Andreini's counsel misstated previous remarks of Mrs. Smith's counsel and that such misstatement was not "appropriate." The trial court did not rule on the objection, nor did Mrs. Smith request a curative instruction. Ordinarily, " '[f]ailure to make timely and proper objection to remarks of counsel made in the presence of the jury, during the trial of a case, constitutes a waiver of the right to raise the

juror, it is apparent that counsel's comments were intended to emphasize the conflicting evidence that had just been presented—particularly with regard to whether Dr. Andreini examined Mrs. Smith's shoulder in the emergency department and whether the shoulder was dislocated at that time. According to Dr. Andreini's evidence, he met Mrs. Smith at the emergency department, examined her shoulder (along with two other physicians), found no evidence of dislocation, and personally placed her wrist in a splint. Dr. Andreini later recounted his emergency department treatment of Mrs. Smith in hospital records that were also presented to jurors. In contrast, Mrs. Smith testified that Dr. Andreini never arrived at the emergency department and, consequently, never examined or treated her there. Mrs. Smith testified she was certain that Dr. Andreini did not place her wrist in the splint (she could not recall who did) and that Dr. Andreini falsified the hospital records he completed following her treatment in the emergency department. Mrs. Smith also stated that although she was upset with Dr. Andreini for failing to show up at the emergency department as promised, she never mentioned his absence during her office visit with him the next day. In fact, Mrs. Smith testified (and her medical records confirmed) that she continued to be treated by Dr. Andreini for at least eighteen more months (including up until six months before trial).

 The purpose of closing arguments is not only to summarize the evidence, but to afford counsel the opportunity to persuade jurors, within acceptable boundaries, to view the evidence in the light most favorable to their client. Thus, advocates are given great latitude in arguing their cases but are also required to "keep within the evidence and not make statements calculated to inflame the minds of jurors intending to induce verdicts warped by prejudice[.]" *State v. Kennedy*, 162 W.Va. at 249, 249 S.E.2d at 191 (1978) (*quoting State v. Lohm*, 97 W.Va. 652, 663, 125 S.E. 758, 762 (1924)). In reviewing

the closing argument of Dr. Andreini's counsel *in toto*, we find that his occasional use of sarcasm and exaggeration during the course of an otherwise traditional recitation of the evidence was obvious and that no reasonable juror would have taken his remarks for their literal meaning. We conclude, therefore, that the trial court abused its discretion in setting aside the verdict and granting a new trial, resulting in clear prejudice to Dr. Andreini's rights in this case. *See* Syl. Pt. 9, Foster., 210 W.Va. at 720, 559 S.E.2d at 57.

## V. Conclusion

Based upon the foregoing, the July 25, 2005, order of the circuit court is hereby reversed.

Reversed.

Justices WORKMAN and KETCHUM concur, in part, and dissent, in part, and reserve the right to file separate opinions.

WORKMAN, Justice, concurring, in part, and dissenting, in part:

(Filed June 9, 2009)

I concur with the majority's decision in this case to the extent that it holds that for purposes of appeal, this Court may consider an improperly granted order declaring a mistrial as an order granting a new trial. I respectfully dissent, however, from the majority's decision insofar as it concludes that the trial court abused it discretion by setting aside the jury's verdict and granting the appellees, Catherine and John Smith, a new trial. I believe that the record as presented to this Court was not sufficient to warrant the reversal of the trial court's order. The Smiths argued below, and the trial court agreed, that they were entitled to a new trial because of certain remarks made by counsel for Dr. Andreini, the appellant, during his closing argument. In this appeal, Dr. Andreini asserted that the trial court erred in granting a new trial because the remarks made by his attorney were merely responsive

question thereafter either in the trial court or in the appellate court.' Syllabus point 6, *Yuncke v. Welker*, 128 W.Va. 299, 36 S.E.2d 410 (1945)." Syl. Pt. 2, *State v. Adkins*, 209 W.Va. 212, 544 S.E.2d 914 (2001). However, in this case, the

trial court stated in its July 25, 2005, order that if Mrs. Smith had not filed a motion for mistrial, it would have, *sua sponte*, granted a mistrial. Thus, we consider this appeal as if Mrs. Smith had made proper and timely objections below.

618

to comments made by counsel for the Smiths during his closing argument and were not prejudicial. In particular, Dr. Andreini stated in his brief submitted to this Court that,

> Mr. Blass [the Smiths' attorney] in the first part of closing argument repeatedly drilled the point that defense expert Mark Rodosky, M.D. was not believable, truthful or credible because he had been impeached with his deposition by Mr. Blass on cross-examination. This was the basis for the accurate statement by Mr. Stuhr [Dr. Andreini's attorney] in closing argument that [the Smiths] would have the jury believe that Dr. Rodosky is lying.

Although Dr. Andreini's argument in this appeal hinged on the closing argument made by counsel for the Smiths, he failed to submit the transcript of the closing argument made by the Smiths' attorney for this Court to review.

"In a long line of unbroken precedent, this Court has held that the responsibility and burden of designating the record is on the parties and that appellate review must be limited to those issues which appear in the record presented to this Court." *State v. Honaker*, 193 W.Va. 51, 56, 454 S.E.2d 96, 101 (1994) (footnote omitted). This Court has explained that

> "[t]he designation of the record is important.... Not only must the significant portion of the record relating to that alleged error be identified, the precise part of the record must be designated. Otherwise, the error will be treated as nonexisting. *See State v. Flint*, [171 W.Va. 676], 301 S.E.2d 765 (W.Va.1983)." II Franklin D. Cleckley, Handbook on West Virginia Criminal Procedure 497–98 (1993).

> It is counsel's obligation to present this Court with specific references to the designated record that is relied upon by the parties. The failure of counsel to file the appropriate parts of the record below makes it difficult for this Court to read the parties' briefs and understand their arguments.

*Id.* at 56 n. 4, 454 S.E.2d at 101 n. 4. Accordingly, this Court has stated that

> "[a]n appellant must carry the burden of showing error in the judgment of which he complains. This Court will not reverse the judgment of a trial court unless error affirmatively appears from the record. Error will not be presumed, all presumptions being in favor of the correctness of the judgment." Syllabus Point 5, *Morgan v. Price*, 151 W.Va. 158, 150 S.E.2d 897 (1966).

Syllabus Point 2, *WV Dept. of Health and Human Resources Employees Federal Credit Union v. Tennant*, 215 W.Va. 387, 599 S.E.2d 810 (2004).

The record indicates that counsel for Dr. Andreini did not attempt to obtain the transcript of the closing argument made by the Smiths' attorney until more than twenty months after the verdict was rendered in this case. Even though the Smiths moved for a mistrial immediately following the closing arguments and even though the trial court held a hearing on the issue three months following the trial, Dr. Andreini's counsel did not request the transcript of the closing argument made by counsel for the Smiths until after the trial court granted a new trial. By that point, the transcript could not be produced because of the death of the trial judge's court reporter. It is clear that if Dr. Andreini's counsel had acted diligently and in a timely manner, the transcript of the closing argument made by the Smiths' attorney could have been obtained. In that regard, counsel for the Smiths acquired the transcript of the closing argument made by Dr. Andreini's attorney and submitted it to the trial court prior to the hearing on their motion for a mistrial.

Absent the transcript of the closing argument made by the Smiths' attorney, I do not believe that the record submitted to this Court provided a basis to reverse the trial court's order granting a new trial. This Court has held that "[t]he discretion of the trial court in ruling on the propriety of argument by counsel before the jury will not be interfered with by the appellate court, unless it appears that the rights of the complaining party have been prejudiced, or that manifest injustice resulted therefrom." Syllabus Point 3, *State v. Boggs*, 103 W.Va. 641, 138 S.E. 321 (1927). In this case, the trial court, after hearing both closing arguments, concluded that "[d]efense counsel went beyond

the scope of proper argument by grossly mischaracterizing Plaintiff's closing argument and by injecting harsh and vituperative remarks." The trial court was in a better position than this Court to make that call, especially given the record presented to this Court. I do not believe there were sufficient grounds to conclude that the trial court abused its discretion in setting aside the verdict and granting a new trial. Accordingly, I would have affirmed the July 25, 2005, order of the trial court.

Based upon the foregoing, I concur, in part, and dissent, in part.

KETCHUM, J., concurring, in part, and dissenting, in part:

I concur with the majority opinion's scholarly discourse regarding the law of "mistrials" and "new trials."

I respectfully dissent, however, to the majority opinion's holding that a new trial should not have been granted. The error in this case was invited by defendant's counsel.

In oral argument, before this Court, defendant's counsel stated that it was important for the trial court and this Court to understand that defense counsel's references to "liars" during closing argument was merely responding to plaintiff counsel's argument that the defendant and some of his witnesses were liars. Defense counsel states he was arguing that plaintiff counsel's characterization of the defendant and his witnesses was unfair.

However, the defendant's counsel did not have the plaintiff's counsel's closing remarks transcribed for review by the trial court, when the defendant responded to the plaintiff's motion for a new trial. Defendant's counsel waited 20 months until *after* the trial court granted a new trial to order a transcript of the plaintiff counsel's closing remarks. By this time the court reporter had died and her notes of the trial testimony lost. No transcript is now available and, unfortunately we cannot read a transcript of the argument to verify defense counsel's claims.

A reasonably prudent attorney responding to a motion after verdict, particularly one involving the remarks of opposing counsel, would have had those remarks transcribed immediately and filed in the court record with a supporting legal memorandum. By waiting until after the trial court ruled on the post-verdict motion 20 months later, the trial court did not have the transcript to consider. The trial court—relying upon his memory of the trial proceedings—concluded that the defense counsel's closing comments prejudiced the outcome of the trial. More importantly, this Court can now only guess at what happened during the plaintiff's portion of the closing argument.

It is obvious defense counsel invited error by the trial court by not providing him the transcript to consider when ruling on the new trial motion. The trial court's recollection, if mistaken, was enhanced by the dilatory conduct of counsel. The defendant's counsel does not have clean hands and should not prevail because the trial court and this Court do not have an ostensibly important part of the closing arguments to review.

At oral argument before this Court, the defendant's counsel shrugged off the lack of a transcript as harmless, saying "hindsight is 20/20." The defense's failure to promptly obtain the transcript of opposing counsel's argument was not a peccadillo.

I therefore respectfully dissent to the reversal of the trial court's order granting a new trial.